No. 16-1392

—————————————————

# United States Court of Appeals
# for the Federal Circuit

—————————————————

United Construction Products, Inc. d/b/a Bison Innovative Products

*Appellee,*

v.

Tile Tech, Inc.

*Appellant,*

—————————————————

Appeal from United States District Court for the Central District of California
Case No. 2:14-CV-08570-R-VBK
United States District Judge Manuel L. Real

—————————————————

## APPELLANT TILE TECH, INC.'S
## OPENING BRIEF

—————————————————

Kelly W. Cunningham, Esq.
Cislo & Thomas LLP
12100 Wilshire Blvd., Suite 1700
Los Angeles, California 90025-7103
Phone: (310) 451-0647
Fax: (310) 394-4477

*Attorneys for Appellant*
*Tile Tech, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Tile Tech, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

      Tile Tech, Inc.

2.     The name of the real party in interest represented by me is:

      Tile Tech, Inc.

3.     All parent corporations and any publicly held companies that own ten

    percent or more of the stock of the party represented by me are:

      None.

4.     The names of all law firms and the partners or associates that ap-

    peared for the party now represented by me in the trial court or agency

    or are expected to appear in this Court are:

      Shahrooz Cyrus Tabibnia, Esq.
      TABIBNIA LAW FIRM (appeared in trial court only)

      Maurice David Pessah, Esq.
      PESSAH LAW GROUP PC (appeared in trial court only)

# **TABLE OF CONTENTS**

## **CONTENTS**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT OF RELATED CASES ................................................. vii

JURISDICTIONAL STATEMENT ..................................................... vii

I.   STATEMENT OF ISSUES ........................................................... 1

II.  STATEMENT OF THE CASE ..................................................... 3

III. STATEMENT OF FACTS ............................................................ 6

IV.  SUMMARY OF THE ARGUMENT ......................................... 10

V.   ARGUMENT ............................................................................. 13

    A.   ABUSE OF DISCRETION IS THE STANDARD WHEN A
        CASE-TERMINATING SANCTION IS INVOLVED ..................... 13

    B.   THE DISTRICT COURT ABUSED ITS DISCRETION IN
        GRANTING THE ENTRY OF DEFAULT JUDGMENT
        WITHOUT A PROPER INQUIRY ................................................... 14

        1.   The Public Interest in Expeditious Resolution of
            Litigation ............................................................................. 15

        2.   The Court's Need to Manage its Docket is Outweighed
            by Public Policy Favoring Disposition of Cases on their
            Merits ................................................................................... 16

        3.   UCP Had Not Been Prejudiced By The Alleged
            Discovery Violations ............................................................ 17

        4.   Less Drastic Sanctions Were Available and would have
            Provided Effective Deterrence for the Alleged Violation ........ 20

5.       Tile Tech's Action Did Not Amount To Willfulness, Fault, or Bad Faith ................................................................26

C.      THE DISTRICT COURT'S INJUNCTION IS OVERBROAD AND MUST BE MODIFIED ............................................................29

1.       The Injunction Is Overbroad Where It Enjoins Patent Infringing Products But Also Other "Substantially Similar" Products .......................................................................29

2.       The Injunction Is Overbroad by Requiring Tile Tech to Surrender Its "Notched Washers" and Molds Therefor Even Though the Notch Washer Is But One Element of the Asserted Combination Patent Claims ..................................30

3.       The Lanham Act Portion of the Injunction Is Overbroad Since It Enjoins All Uses of Images of UCP's, Even Where There Would Be No Likelihood of Confusion.............32

VI.     REQUEST FOR REASSIGNMENT ON REMAND ...................................33

VII.    CONCLUSION.............................................................................................34

# TABLE OF AUTHORITIES

**Cases**

Adriana Intl. Corp. v. Lewis & Co.,
  913 F.2d 1406 (9th Cir. 1990) ............................................................... 15

BVD Licensing Corp. v. Body Action Design, Inc.,
  846 F.2d 727 (Fed. Cir. 1988) ............................................................... 16

Champion Spark Plug Co. v. Sanders,
  331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947) ............................. 33

Cybor Corp. v. FAS Technologies, Inc.,
  138 F.3d 1448 (Fed. Cir. 1998) (en banc) ............................................. 29

Enzo Biochem, Inc. v. Gen-Probe Inc.,
  323 F.3d 956 (Fed. Cir. 2002) ............................................................... 16

Fjelstad v. American Honda Motor Co., Inc.,
  762 F.2d 1334 (9th Cir. 1985) ...................................................... passim

Halaco Engineering Co. v. Costle,
  843 F.2d 376 (9th Cir. 1988) ................................................................. 22

Henry v. Gill Industries, Inc.,
  983 F.2d 943 (9th Cir. 1993) ................................................................. 18

Hunt v. National Broadcasting Co.,
  872 F.2d 289 (9th Cir. 1989) .......................................................... 13, 25

In re Hammer,
  940 F.2d 524 (9th Cir. 1991) ................................................................. 13

In Re the Exxon Valdez,
  102 F.3d 429 (9th Cir. 1996) ................................................................. 19

Information Systems & Networks Corp. v. U.S.,
  994 F.2d 792 (Fed. Cir. 1993) ............................................................... 13

Lear v. Adkins,
  395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed. 2d 610 (1969) .......................... 17

Malone v. United States Postal Serv.,
   833 F.2d 128 (9th Cir. 1987) ............................................................ 10, 14, 17, 21

McCalden v. Cal. Library Ass'n,
   955 F.2d 1214, 1224 (9th Cir.1990) .......................................................34

Network Automation, Inc. v. Advanced Systems Concepts, Inc.,
   638 F.3d 1137 (Fed. Cir. 2011) .............................................................33

NHL v. Metro. Hockey Club,
   427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed. 2d 747 (1976) .........................................21

Raylon, LLC v. Complus Data Innovations, Inc.,
   700 F. 3d 1361 (Fed. Cir. 2012) ........................................................ 13, 25

Refac Int'l, Ltd. v. Hitachi, Ltd.,
   921 F.2d 1247 (Fed. Cir. 1990) .............................................................13

Research Corp. Techs. v. Microsoft Corp.,
   536 F.3d 1247 (Fed. Cir. 2008) ........................................................ 34, 36

Standard Havens Prods., Inc. v. Gencor Indus., Inc.,
   897 F.2d 511 (Fed.Cir.1990) .............................................................16

Trimed, Inc., v. Stryker Corp.,
   608 F.3d 1333 (Fed. Cir. 2010) ...........................................................36

United States use of Wiltec Guam, Inc. v. Kahaluu Construction Co.,
   Inc.,
   857 F.2d 600 (9th Cir. 1988) ......................................................... 18, 21

United States v. National Medical Enterprises, Inc.,
   792 F.2d 906 (9th Cir. 1986) .............................................................21

Valley Engineers v. Electric Engineering Co.,
   158 F.3d 1051 (9th Cir. 1998) ............................................................22

Wanderer v. Johnston,
   910 F.2d 652 (9th Cir. 1990) ......................................................... 15, 17

Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,
   520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed. 2d 146 (1997) ................................... 29, 30

Webster v. Dep't of the Army,
  911 F.2d 679 (Fed. Cir. 1991) ........................................................ 14, 25

**Statutes**

28 U.S.C. § 1295 ..................................................................... vii

28 U.S.C. § 2106 ......................................................................34

28 U.S.C. § 2107 ..................................................................... vii

**Rules**

Fed. R. Civ. P. 30(b)(6) ......................................................... 4, 19

Fed. R. Civ. P. 37 ....................................................................13

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Tile Tech, Inc. ("Appellant" or "Tile Tech") states that no other appeal in or from the same civil action was previously before this or any other appellate court.

## JURISDICTIONAL STATEMENT

This Court has exclusive jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1) because this is an appeal from a final decision of the United States District Court for the Central District of California of a civil action arising under the federal Acts of Congress relating to patents.

Jurisdiction of this appeal was timely conferred upon this Court pursuant to 28 U.S.C. § 2107(a) because Tile Tech filed its Notice of Appeal of this final decision on December 29, 2015, which was within thirty (30) days of the date (December 1, 2015) the District Court entered the final decision.

# I.    <u>STATEMENT OF ISSUES</u>

1.    Did the District Court err in entering default judgment against Tile Tech on the grounds of discovery violations without conducting the necessary analysis of weighing the Ninth Circuit <u>Malone</u> factors, especially, the factor of the availability of less drastic sanctions?

2.    Did the District Court err in entering default judgment on the grounds of discovery violations, despite the fact that Tile Tech indeed responded to the discovery requests and supplemented its responses, and that the Court ultimately concluded Tile Tech's trial counsel did not act in bad faith?

3.    Did the District Court err in overbroadly enjoining Tile Tech from selling or offering for sale "any adjustable building surface support product incorporating the Patent, or any ***substantially similar*** adjustable building surface support product" (emphasis added)?

4.    Did the District Court err in enjoining Tile Tech to surrender to United Construction Product (hereinafter "UCP") "all notched washers" that Tile Tech made despite the fact that 'notched washer' was merely ***a single element*** within the asserted combination patent claim?

1

5.     Did the District Court err in enjoining Tile Tech from "using images of [UCP's] products, projects and drawings [in any] marketing materials" based on UCP's Lanham Act claim without limiting such injunction to such uses that create a likelihood of confusion?

## II.   <u>STATEMENT OF THE CASE</u>

This case arises from a complaint alleging patent infringement in which the Appellant, Tile Tech, was accused of infringing U.S. Patent No. 8,302,356 ("the '356 Patent) owned by UCP.  Tile Tech is a small business run by Ramin "Ronnie" Tabibnia (hereinafter "Mr. Tabibnia").  (A822).

When Tile Tech was sued for allegedly infringing the '356 Patent, Tile Tech hired Shahrooz "Cyrus" Tabibnia, a relative of Mr. Tabibnia, to defend Tile Tech in the action.  (A822).  Attorney Tabibnia primarily practices in state, not federal, court (A1348), but since the action clearly involved no actionable damages, a fact which was borne out (including in the ultimate default judgment (*see*, A1-A6)), Shahrooz Cyrus Tabibnia, Esq. (hereinafter, "Attorney Tabibnia" or "Tile Tech's trial counsel") agreed to take on the case to avoid a loss by fiat while limiting the cost of a defense.  During the hearing regarding the motion for default judgment held on November 16, 2015, Tile Tech's trial counsel admitted to the District Court that he made strategic mistakes as a result of his unfamiliarity with federal court proceedings.  (A1348).

During discovery, UCP propounded one set of interrogatories, one set of document requests, and one set of requests for admissions.  (A282).  Tile Tech served responses to these discovery requests (A820), and when UCP claimed the responses were inadequate, Tile Tech unequivocally agreed to supplement them.

(A820).  UCP nevertheless filed a motion to compel supplemental responses (A221), and Tile Tech served supplemental responses shortly thereafter, before the time for Tile Tech to file any opposition to the motion.  (A820).  Tile Tech's trial counsel mistakenly thought that supplementing the responses would effectively render the motion moot (A821), and he therefore did not file any opposition.  The Court, however, canceled the hearing (A821), issued an order granting the motion as unopposed, and awarded UCP its attorney's fees in bringing the motion.  (A422).

UCP also served a Fed. R. Civ. P. 30(b)(6) deposition notice to depose Tile Tech and Mr. Tabibnia both on October 9, 2015.  (A764).  On that date, Tile Tech produced Mr. Tabibnia as its Fed. R. Civ. P. 30(b)(6) designee and in his individual capacity.  (A425).  Mr. Tabibnia brought to the deposition further documents responsive to the discovery requests.  (A426).

UCP nevertheless filed a motion for default judgment (A756).  Tile Tech opposed the motion attempting to show the Court the efforts Tile Tech made to satisfy UCP's discovery demands (A803).  Despite this showing, the District Court insisted at the hearing on the motion that Mr. Tabibnia had produced nothing:

> MR. [ATTORNEY] TABIBNIA:  We have, Your Honor.  We produce a third set of discovery.
>
> THE COURT: You produced nothing.  You produced nothing.

> MR. [ATTORNEY] TABIBNIA: We absolutely have, Your Honor.
>
> THE COURT: Nothing.
>
> MR. [ATTORNEY] TABIBNIA: Your Honor, we absolutely have to produced--
>
> THE COURT: You produced a nothing.  A nothing.
>
> MR. [ATTORNEY] TABIBNIA: A nothing?  Your Honor--
>
> THE COURT: A nothing.

(A1353).

The Court then granted the motion for default judgment.  Ultimately, however, in reviewing the case on UCP's motion for attorney's fees, the court denied UCP's motion for attorney's fees, expressly concluding that, "while defense counsel perhaps handled the case unreasonably, this Court ***does not attribute that to bad faith***, but instead a complete lack of preparation."  (A1611) (emphasis added).

Based on the record, it does not appear that the Court considered the <u>Malone</u> factors for a case-terminating sanction, but did conclude Tile Tech did not act in bad faith in committing its discovery violations.  Since the District Court failed to consider the availability of less drastic sanctions, since it concluded that Tile Tech was not in bad faith, and since Tile Tech's trial counsel did indeed supplement discovery responses multiple times, the District Court abused its discretion in granting

default judgment.  This Court should thus vacate the default judgment and remand the case.

Additionally, the injunction that the Court entered was overbroad in three ways.  It enjoined not only infringing products, but also "any substantially similar" products.  It ordered Tile Tech to hand over all "notched" washers, even though notched washers, in and of themselves, are just one element of the asserted combination patent claim and therefore do not infringe.  And, for the alleged Lanham Act violation, the Court enjoined Tile Tech from using any images of UCP's products even if it creates no likelihood of confusion.  For these reasons, the injunction must be overturned, the default judgment should be vacated, and the case should be remanded with an instruction to reassign the case to another district court judge.

## III.    **STATEMENT OF FACTS**

UCP filed its original complaint for patent infringement against Tile Tech in the District Court of Colorado (A63), but upon the stipulation of the parties, the Colorado District Court transferred the case to the Central District of California. (A88).  On January 9, 2015, Tile Tech answered the complaint (A123), and following the Rule 26(f) meeting, the Court on April 2, 2015 entered its scheduling order setting October 19, 2015 as the discovery cutoff date and December 8, 2015 as the first day of trial.  (A139).

UCP served its first sets of interrogatories, requests for admissions, and document requests on April 14, 2015, but Tile Tech claimed it had not received them since Tile Tech's attorney had moved offices. (A819). After Tile Tech did receive UCP's discovery requests, Tile Tech served its responses to the discovery requests on June 15, 2015. (A819-A820). UCP claimed that Tile Tech's responses were deficient, and, on July 28, 2015, the parties met and conferred and Tile Tech agreed to supplement responses or produce documents. When Tile Tech had not responded by August 17, 2015, UCP initiated a motion to compel, which it ultimately filed on August 26, 2015. (A221). Eight (8) days later, Tile Tech served "further" responses to the interrogatories and requests for admissions discovery requests. (A820). In the hearing for the motion for entry of default judgment, Tile Tech's trial counsel admitted that he thought his act of serving the further responses would render the motion to compel moot. (A821).

On September 24, 2015, UCP claimed that Tile Tech's responses remained deficient, and Tile Tech shortly thereafter on October 2, 2015 served further responses to UCP's document requests. (A763). Unaware of this supplementation, the District Court granted UCP's motion to compel on October 5, 2015; awarded UCP sanctions in the amount of the attorney's fees it had incurred in preparing the motion, $4,024.50; and ordered Tile Tech to file supplemental responses in good faith by October 12, 2015 to avoid a default judgment. (A422-A423).

On October 9, 2015, UCP took the depositions of Tile Tech and Mr. Tabibnia, at which Mr. Tabibnia produced additional documents and things responsive to UCP's document requests.  (A1351).  Tile Tech, however, did not formally file supplemental responses.

Three days later, UCP filed a motion for entry of default judgment.  (A756).  The following week, on October 19, 2015, discovery closed, and Tile Tech and UCP filed their respective trial witness lists and their joint trial exhibit list.  (A772-A789).  Yet, on the same day, the District Court granted UCP's motion for leave to amend its complaint (A802), and as a result, UCP's First Amended Complaint was effectively filed and served on October 19, 2015 alleging for the first time the new cause of action of unfair competition.  (A404-A411).

Tile Tech filed its opposition to the motion for entry of default judgment on October 22, 2015 (A803), and served its third response to UCP's interrogatories and requests for admissions on November 2, 2015.  (A1382).

On November 12, 2015, due in part to UCP's entirely new claim for unfair competition, Tile Tech filed an *ex parte* application to continue the trial and reopen limited discovery related to the new unfair competition claim.  (A1165).  On November 13, 2015, UCP filed its opposition to Tile Tech's *ex parte* application.  (A1229).

On November 16, 2015, during its hearing on the motion for entry of default judgment, the District Court repeatedly accused Tile Tech of producing "nothing" in response to the discovery requests, even though, by this time, Tile Tech had served three sets of responses to UCP's discovery request and had produced Mr. Tabibnia for deposition as its Rule 30(b) designee:

> MR. [ATTORNEY] TABIBNIA:  We have, Your Honor.  We produce a third set of discovery.
>
> THE COURT: You produced nothing.  You produced nothing.
>
> MR. [ATTORNEY] TABIBNIA: We absolutely have, Your Honor.
>
> THE COURT: Nothing.
>
> MR. [ATTORNEY] TABIBNIA: Your Honor, we absolutely have to produced--
>
> THE COURT: You produced a nothing.  A nothing.
>
> MR. [ATTORNEY] TABIBNIA: A nothing?  Your Honor--
>
> THE COURT: A nothing.

(A1353).

On December 1, 2015, the District Court entered default judgment in favor of UCP, even though the District Court ultimately concluded that Tile Tech and its trial counsel were not in bad faith, stating:

> [W]hile defense counsel perhaps handled the case unreasona-
> bly, this Court does *not* attribute that to *bad faith*, but instead a
> complete lack of preparation.

(A1611) (emphasis added).

## IV.    SUMMARY OF THE ARGUMENT

This case exemplifies the old adage "you get what you pay for." Mr. Tabib-nia may have received what he paid for, but he did not get what he deserved. Mr. Tabibnia has been unfairly punished for his counsel's failures as evidenced by the fact that the District Court did not conduct the proper analysis for granting a default judgment.

Default judgments are reserved for the most egregious conduct in court. To justify a default judgment, the court must weigh a number of factors in making its decision to enter a default judgment. These factors include: (1) the public interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) prejudice to other parties from discovery violations; (4) public policy favoring disposition of cases on their merits; and (5) whether less drastic sanctions are available and would provide effective deterrence for the particular violation. Malone v. United States Postal Serv., 833 F.2d 128, 130 (9th Cir. 1987). When terminating sanctions are involved, as they were here, the court's discretion is further narrowed by requiring a showing of willfulness, bad faith, or fault of the petitioner. Fjelstad v. American Honda Motor Co., Inc., 762 F.2d 1334, 1337 (9th Cir. 1985).

10

These factors demonstrate that the entry of default judgment was in error. First, this case could have proceeded to an expeditious resolution. Even if the trial date had been continued by ninety days as Tile Tech had requested, disposition would have been expeditious relative to the national average, or even the district court averages within the Ninth Circuit.

Second, the court's need to manage its docket is outweighed by the public policy favoring disposition of cases on their merits. In particular, there is a strong public policy favoring free competition where there are no exclusive patent rights, which is undercut when a default judgment rules a patent valid and enforceable without an adjudication on its merits. The District Court's ruling could affect cost, availability, and competition in the industry.

Third, although responses to discovery were delayed, they were provided. There was, therefore, no prejudice to UCP, particularly in light of the fact that UCP's business was not threatened while the litigation was pending and the pre-trial and trial schedule were particularly fast, leaving time for Tile Tech's requested 90-day extension of the trial date.

Fourth, numerous less drastic sanctions were available and would have provided effective deterrence, especially in light of the revelation that Tile Tech's attorney did not understand the rules and procedures of the federal court system. A few examples of far less drastic sanctions that would have been effective include, a

second sanction, a sanction on Tile Tech's trial counsel, or a warning to Tile Tech's trial counsel to become familiar with the federal court rules and procedures or otherwise to engage a competent federal court litigator to assist or to take over the case.

Lastly, the District Court ultimately concluded that the discovery violations in this case were not in bad faith, and the Ninth Circuit prohibits default judgment absent bad faith. *See*, Fjelstad, 762 F.2d at 1337. For these reasons, the District Court's entry of default judgment should be reversed and this case remanded to proceed based on its merits.

Also, the injunction the District Court entered was overbroad in that it enjoined all products that are "substantially similar" to products that practice the asserted patent, in that it required Tile Tech to hand over all "notched" washers, even though the notched washer was just one element of the asserted combination patent claims, and in that it enjoined (with respect to the Lanham Act claim) Tile Tech from using images of UCP products even if such use would not create a likelihood of confusion. The injunction therefore must also be vacated or modified.

# V.    ARGUMENT

## A.    ABUSE OF DISCRETION IS THE STANDARD WHEN A CASE-TERMINATING SANCTION IS INVOLVED

Review of Fed. R. Civ. P. 37 sanctions is a procedural question not unique to patent law; thus, Ninth Circuit precedent applies.  Refac Int'l, Ltd. v. Hitachi, Ltd., 921 F.2d 1247, 1254 (Fed. Cir. 1990).  In the Ninth Circuit, the imposition of discovery sanctions under Fed. R. Civ. P. 37 is reviewed under an abuse of discretion standard.  Id.; Malone, 833 F.2d at 130.  "Where the drastic sanctions of dismissal or default are imposed, however, the range of discretion is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad faith."  Fjelstad, 762 F.2d at 1337.

Since a trial on the merits is so heavily favored over default judgment, close cases should be resolved against a default judgment. Information Systems & Networks Corp. v. U.S., 994 F.2d 792, 795 (Fed. Cir. 1993) (*citing*, In re Hammer, 940 F.2d 524, 525 (9th Cir. 1991)).

An abuse of discretion may occur when a district court does not apply the correct law or misinterprets the applicable law.  Hunt v. National Broadcasting Co., 872 F.2d 289, 292 (9th Cir. 1989); *see, also*, Raylon, LLC v. Complus Data Innovations, Inc., 700 F. 3d 1361, 1367-68 (Fed. Cir. 2012) (district court abused discretion by applying wrong standard in determining whether Rule 11 sanctions

were warranted and by failing to consider arguments presented in response to a sanctions motion); *and* <u>Webster v. Dep't of the Army</u>, 911 F.2d 679, 694 (Fed. Cir. 1991) ("Failure to consider a relevant factor constitutes an abuse of discretion.").

**B.    THE DISTRICT COURT ABUSED ITS DISCRETION IN GRANTING THE ENTRY OF DEFAULT JUDGMENT WITHOUT A PROPER INQUIRY**

The District Court must weigh the following five factors before imposing a case-terminating sanction: (1) the public interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.  <u>Malone</u>, 833 F.2d at 130.

Below, Tile Tech addresses each factor in turn, although it is worth noting at the outset that the District Court made no indication at all that it considered any of these factors, and gave this Court scant material to make any review whatsoever of the District Court's analysis, if any.  (*See*, A1352-53).

///

///

///

14

**1.    The Public Interest in Expeditious Resolution of Litigation**

Generally, "[w]here a court order is violated, the first two factors support sanctions and the fourth factor cuts against a default. Therefore, it is the third and fifth factors that are decisive." <u>Adriana Intl. Corp. v. Lewis & Co.</u>, 913 F.2d 1406, 1412 (9th Cir. 1990); <u>Wanderer v. Johnston</u>, 910 F.2d 652, 656 (9th Cir. 1990) (noting the two key factors often are the risk of prejudice and the availability of lesser sanctions.).

Here, however, the public interest in expeditious resolution of litigation would be satisfied if lesser sanctions were issued and the case continued through trial. Even if the District Court had granted Tile Tech's motion to continue the trial date by ninety (90) days (A1203), the length of time between the close of pleadings and such trial – thirteen (13) months -- would still have been quite expeditious, far more expeditious than the national average of 25.2 months for District Courts in 2015. Tile Tech requests that this Court take judicial notice of this and the accompanying statistics that the Federal Courts publish annually regarding the median time intervals from filing to disposition of civil cases. The Federal Courts' most recently published statistics can be found at http://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2015-

tables, and are reproduced in the Addendum attached to the end of the present brief.

"The Federal Circuit may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions pursuant to Fed. R. Evid. 201(b) and (f)." BVD Licensing Corp. v. Body Action Design, Inc., 846 F.2d 727, 728 (Fed. Cir. 1988) (taking judicial notice that within United States, the BVD trademark was "widely" known); Enzo Biochem, Inc. v. Gen-Probe Inc., 323 F.3d 956, 964 (Fed. Cir. 2002) (giving judicial notice to the PTO Guidelines); Standard Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 514 n. 3 (Fed.Cir.1990) (holding that it is appropriate to take judicial notice of PTO correspondence which is part of the public record).

This factor, therefore, weighs in favor of finding that the District Court abused its discretion, vacating the default judgment, and remanding this case for trial on the merits, which can still be done expeditiously.

## 2. The Court's Need to Manage its Docket is Outweighed by Public Policy Favoring Disposition of Cases on their Merits

The nature of the default judgment leaves, not only Tile Tech, but also the entire industry subject to a judicial finding of fact, through default judgment only,

16

that the asserted patent is valid and enforceable. This risks unduly stifling compe-

tition. The public policy favoring disposition of cases on the merits is therefore

particularly strong in patent cases. *See, e.g.*, Lear v. Adkins, 395 U.S. 653, 656, 89

S.Ct. 1902, 23 L.Ed. 2d 610 (1969), (acknowledging "the strong federal policy fa-

voring free competition in ideas which do not merit patent protection").

### 3.    UCP Had Not Been Prejudiced By The Alleged Dis-
### covery Violations

UCP had not been prejudiced by Tile Tech's alleged discovery violations.

Given the less drastic sanctions available to the District Court, there were numer-

ous opportunities for lesser sanctions that would result in no significant prejudice

to UCP. As mentioned above, a short ninety-day extension of the trial date would

have allowed UCP to have avoided any prejudice, and still have received its day in

court well under the time interval of the national average.

"In determining whether a defendant has been prejudiced, we examine

whether the plaintiff's actions impair the defendant's ability to go to trial or threat-

en to interfere with the rightful decision of the case." Malone, 833 F.2d at 131.

"Delay alone, without a focus on its effects, will not justify dismissal or default."

Wanderer, 910 F.2d at 656.

In <u>United States use of Wiltec Guam, Inc. v. Kahaluu Construction Co., Inc.</u>, the Ninth Circuit reversed the district court's order that prevented defendant-appellant from defending itself in the litigation despite the discovery violations and defendant-appellant's failure to comply with the rules due, in part, to a lack of prejudice and the district court's failure to consider alternative sanctions. <u>United States use of Wiltec Guam, Inc. v. Kahaluu Construction Co., Inc.</u>, 857 F.2d 600, 605 (9th Cir. 1988). Some of the violations of the defendant-appellant included a failure of the defendant-appellant to appear at a noticed deposition, failure to comply with local rules in filing a memorandum with the district court, and failure to comply with Federal Rules of Civil Procedure in filing an opposition to a motion. <u>Id.</u> at 601-602.

In finding a lack of prejudice against the plaintiff-appellees, the Ninth Circuit stated:

> There is no indication that the defendants' violations in any way threatened to distort the resolution of Wiltec's claim. Kahaluu's deposition, while delayed, was in fact taken before the motion for sanctions was heard.... Thus the defendants' violations, while they certainly caused serious inconvenience for Wiltec, did not prejudice the outcome of Wiltec's action.

<u>Id.</u> at 604.

Prejudice has been found where delays led to the unavailability of witnesses or a complete lack of response to discovery requests. *See*, <u>Henry v. Gill Industries, Inc.</u>, 983 F.2d 943, 948 (9th Cir. 1993) (prejudice found where key witness was no

longer able to assist with the defense of the case due to illness); and In Re the Exxon Valdez, 102 F.3d 429, 433 (9th Cir. 1996) ("The appellant's total failure to respond to discovery and the time consumed by attempting to secure compliance prejudiced appellees.")

Here, the record does not indicate any prejudice to UCP.  First, Tile Tech produced responses to the discovery requests, including two supplemental responses in light of UCP's allegations of deficiencies in the responses.

In addition, following the order granting the motion to compel, Tile Tech had its deposition taken and produced additional documents during its deposition. Given that a deposition is a sworn testimony taken under the penalty of perjury, UCP had an opportunity to obtain any information it believed was deficient in the responses to the written discovery requests.

Also, Tile Tech agreed to make its representative available for further depositions.  Therefore, unlike Exxon Valdez, Tile Tech cannot be accused of a total failure to respond to the discovery requests when Tile Tech responded to discovery requests, supplemented responses twice, had its 30(b)(6) deposition taken, and was willing to make itself available for further depositions.  Furthermore, Tile Tech's expert report was served on UCP.  Indeed, the District Court had just on October 19, 2015 granted UCP's motion to add a new claim for relief.

In addition, there were no allegations by UCP, or the finding by the District Court, that witnesses would no longer be available due to any alleged delay. In fact, on October 19, 2015, shortly after the motion for entry of default judgment was filed, both UCP and Tile Tech filed their respective witness lists as well as a joint exhibit list. While there were some "hiccups" in the discovery process, the case was on track for a trial in early 2016. There was no prejudicial delay at all (see the District Court statistics reproduced at the end of the Addendum, attached hereto).

In light of the fact that UCP did not assert that the discovery violations have led to unavailability of witnesses, loss of evidence, or interference in its business practices, and since Tile Tech produced discovery responses, including supplemental responses, and had its deposition taken, no prejudice has been demonstrated by the alleged discovery violations. Therefore, this factor strongly favors reversal.

**4.    Less Drastic Sanctions Were Available and would have Provided Effective Deterrence for the Alleged Violation**

Entry of default judgment, effectively terminating the case, is a drastic measure made available to the district courts "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might

20

be tempted to such conduct in the absence of such a deterrent." <u>NHL v. Metro. Hockey Club</u>, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed. 2d 747 (1976). "As a general rule, the district court **must** consider less severe alternatives **and discuss them** if it elects to dismiss." <u>Kahaluu Construction</u>, 857 F.2d at 604 (emphasis added).

The following factors must be considered when a district court has considered alternatives to dismissal: (1) Did the court explicitly discuss the feasibility of less drastic sanctions and explain why alternative sanctions would be inadequate? (2) Did the court implement alternative methods of sanctioning or curing the malfeasance before ordering dismissal? (3) Did the court warn the plaintiff of the possibility of dismissal before actually ordering dismissal?" <u>Malone</u>, 833 F.2d at 132.

The Ninth Circuit has held that the district court abuses its discretion if it imposes a dismissal sanction "without first considering the impact of the sanction and the adequacy of less drastic sanctions." <u>Kahaluu Construction</u>, 857 F.2d at 604 (<u>citing</u>, <u>Malone</u>, 833 F.2d at 131), <u>United States v. National Medical Enterprises, Inc.</u>, 792 F.2d 906, 912 (9th Cir. 1986).

In <u>Halaco Engineering Co. v. Costle</u>, at the hearing on the motion for dismissal, the district court stated the following rationale for granting a case-terminating sanction:

> [T]he appropriate remedy for the EPA's conduct is a dismissal
> of EPA's counterclaim, and the striking of its answer. The court

21

is aware that this is an environmental case; however, the gov-
ernment's conduct is so outrageous as to require this sanction.

Halaco Engineering Co. v. Costle, 843 F.2d 376, 381 (9th Cir. 1988).

To this the Ninth Circuit remarked:

> [t]his statement by the district court is an insufficient considera-
> tion of lesser sanctions. This court has said that the considera-
> tion of less severe penalties must be a reasonable explanation of
> possible and meaningful alternatives. The district court did not
> make such an explanation.

Id. at 381 (citations omitted).

By contrast, when the dismissal of a case is upheld, repeated lesser sanctions
have been found unsuccessful in changing the violator's conduct. In one case, the
Ninth Circuit found "[t]he district judge had repeatedly imposed monetary sanc-
tions on Electric Engineering and its bonding company; the sanctions had not
worked to shake the Carroll memorandum loose." Valley Engineers v. Electric
Engineering Co., 158 F.3d 1051, 1057 (9th Cir. 1998).

Given the gravity of a default judgment, district courts are generally inclined
to give the offending party opportunities to correct their violations. In Fjelstad, the
Ninth Circuit stated "allowing American Honda to suffer partial default judgment
because of its single willful violation of the July 29 order would be unjust." Fjel-
stad, 762 F.2d at 1342. Part of the Ninth Circuit's rationale was because American
Honda made available to the plaintiffs a number of witness statements, numerous
photographs, videotapes, reports, and the like, and nothing in the record suggested

adverse effects to the plaintiff for failing to identify a potential witness in a timely manner. Id. at 1342-43.

Here, like Fjelstad, the District Court issued only one monetary sanction in the amount of approximately $4,024.50 to compel Tile Tech to respond to the discovery requests. Although Tile Tech's responses were delinquent, Tile Tech did respond. In addition, Tile Tech supplemented its responses twice, allowed a deposition to take place, was willing to allow additional depositions of the same deponent, and produced an expert report. These facts demonstrate Tile Tech's willingness to litigate this matter and not prejudice UCP. These facts further demonstrate that the District Court's initial sanction achieved at least something of the desired effect.

Furthermore, the District Court failed to consider less drastic sanctions after having been made aware of the reasons for Tile Tech's discovery violations. At the hearing for the Motion for Entry of Default Judgment, Tile Tech's attorney explained that a lot of the errors were due to Tile Tech's attorney's lack of experience in federal court as he mainly practiced in state court. Attorney Tabibnia stated:

> [T]he order against our client is a strategic mistake that as an attorney I made, meaning we provided responses, and I thought--
> I'm generally state attorney. I'm rarely in federal court.

(A1348).

Therefore, it appears that much of the conduct of Tile Tech's trial counsel is based on the fact that he normally practiced in state court, not federal court. This explains Attorney Tabibnia's unfamiliarity with the more rigid practices in the federal court system.

Realizing this confession as the source of the discovery problems, the District Court had an opportunity to reprimand Attorney Tabibnia, and warn Tile Tech to either force its attorney to familiarize himself with the federal court rules and practices, or find an attorney who regularly practices in federal court, and more specifically, practices patent law. Instead, the District Court simply stated that Tile Tech had produced "nothing," and when Tile Tech's attorney claimed that he did comply by producing documents, the District Court repeatedly asserted that "nothing" had been produced. (A1353).

Thus, the District Court failed to discuss or address the feasibility of less drastic sanctions and explain why none of the less drastic sanctions would have been adequate.

By way of example only, the District Court could have issued additional monetary sanctions with a warning to Attorney Tabibnia that his lack of experience, knowledge, or practice in the federal court will no longer be tolerated and that he would need to associate with a federal court litigator for the case. In addition to, or in lieu of the above lesser sanction, the District Court could have im-

posed more severe evidentiary sanctions related to what was purportedly being withheld, which would have at least allowed the case to proceed to trial.

In addition to any of the lesser sanctions above, the District Court could have postponed the trial date (as requested by Tile Tech), particularly in light of the fact that the District Court acknowledged that this "case does not stand out from others with respect to the substantive strength of a party's litigation position." (A1611.)

This latter option would have been a fair result to both parties as Tile Tech had also been prejudiced by UCP's discovery misconduct.  In particular, UCP tactically produced its expert report only nine days before close of discovery.  Though Tile Tech requested to depose UCP's expert, UCP denied the request due to the short notice relative to the close of discovery, a circumstance entirely precipitated by UCP's late disclosure of its expert.

Failure to apply the correct law or applying wrong legal standard constitutes an abuse of discretion, Hunt, 872 F.2d at 292; Raylon, 700 F.3d at 1367-68, as is a failure to consider relevant factors mandated by the correct law.  Webster, 911 F.2d at 694.  In light of the District Court's failure to consider the obvious availability of lesser sanctions and failure to address really any of the Malone factors is an abuse of discretion warranting reversal by this Court.  It appears that justice was

not served and the District Court simply penalized Tile Tech rather than insuring future compliant behavior by Tile Tech's trial counsel.

### 5.    Tile Tech's Action Did Not Amount To Willfulness, Fault, or Bad Faith

The District Court determined that Tile Tech's action did not amount to bad faith. (A1611).  The District Court, therefore, should not have penalized Tile Tech for the failures of its trial counsel.  Tile Tech's conduct, notwithstanding its trial counsel lack of preparation, was not so egregious as to warrant default judgment.

Based on the District Court record, Tile Tech was not attempting to undermine the judicial system by deliberately obstructing discovery and purposefully withholding evidence.  Rather, Tile Tech responded to the discovery requests, including two supplemental responses, made itself available for deposition, and served its expert report.  It was Tile Tech's attorney's lack of familiarity with federal court practice, not some willful effort to interfere with the litigation process, as the District Court itself acknowledged.

Though UCP repeatedly contended that Tile Tech's discovery responses were deficient, the record did not indicate that the court actually reviewed any of the responses, including the supplemental responses thereto, to determine the validity of such an accusation.  Based on the hearing for the Motion for Entry of De-

fault Judgment, it appeared that Tile Tech's attorney believed the responses were adequate, and that any responses may have remained allegedly "deficient" were in such a state because Tile Tech needed an expert to respond to the inquiry. Once an expert was retained, Tile Tech responded by presenting the expert report to UCP.

Furthermore, the deposition of Tile Tech was taken on October 9, 2015 and Tile Tech's representative was willing to make himself available for further deposition, if needed. At the deposition, Tile Tech produced additional documents that it believed would be responsive to the discovery requests.

Therefore, even though Tile Tech responded to the discovery requests, supplemented its responses twice due to allegations of deficiency in the response, allowed its 30(b)(6) deposition to be taken and produced additional documents at the deposition, and provided an expert report in response to allegations of deficient responses, the District Court, without any indication that it had conducted any analysis of the discovery responses whatsoever, concluded that Tile Tech produced "nothing," which was inaccurate.

The manner in which the District Court made its conclusory remarks is telling. When the District Court accused Tile Tech of not have complied with its discovery compel order, the exchange was as follows:

> THE COURT: You produced nothing. You produced nothing.
>
> MR. [ATTORNEY] TABIBNIA: We absolutely have, Your Honor.

THE COURT: Nothing.

MR. [ATTORNEY] TABIBNIA: Your Honor, we absolutely have to produced--

THE COURT: You produced a nothing.  A nothing.

(A1353).

In this short exchange, the District Court repeatedly stated that Tile Tech produced "nothing" six times, but the District Court did not provide any explanation or analysis.  The District Court made no reference to any specific discovery request or how any particular discovery response was inadequate.  The District Court made no comment about the deposition that was taken and the documents produced at the deposition, nor any comment about the expert report that was submitted in response to one of the discovery requests.  In other words, without making a single comment about the quality of the actual discovery responses provided, the District Court concluded that "nothing" was produced in response to the discovery requests and entered a default judgment, the most severe of remedies.

The discovery violations, as the District Court pointed out, were not a product of bad faith, but rather because of a lack of preparedness, and likely a lack of experience dealing with federal court practice.  Given the lack of bad faith, as evidenced by the District Court's admission, and the District Court's lack of any

comment (let alone analysis) regarding the alleged deficiency of the discovery responses, the District Court's entry of default judgment was an abuse of discretion.

## C.    THE DISTRICT COURT'S INJUNCTION IS OVERBROAD AND MUST BE MODIFIED

### 1.    The Injunction Is Overbroad Where It Enjoins Patent Infringing Products But Also Other "Substantially Similar" Products

The injunction entered by the District Court is improper in that it enjoins not only "any adjustable building surface support product incorporating the Patent," but additionally "any substantially similar adjustable building surface support product." In extending the injunction to "substantially similar" products to those "incorporating the Patent," the District Court ignored Supreme Court precedent in Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 28, 117 S.Ct. 1040, 137 L.Ed. 2d 146 (1997), among others, that courts must evaluate patent infringement on an element-by-element basis.

Patent infringement requires that the accused product possess every limitation recited in at least one claim of the patent. Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). A product that has each of the claimed elements in a literal sense infringes literally. A product that does not

literally infringe a patent claim may nevertheless still infringe the patent under the doctrine of equivalents. <u>Warner-Jenkinson</u>, 520 U.S. at 28. Since each element contained in a patent claim is deemed material to defining the scope of the patented invention, the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. <u>Id.</u> at 29. By extending the injunction to "substantially similar" products, the District Court in effect applied the doctrine of equivalents to the invention as a whole and violated this Supreme Court prohibition.

### 2. The Injunction Is Overbroad by Requiring Tile Tech to Surrender Its "Notched Washers" and Molds Therefor Even Though the Notch Washer Is But One Element of the Asserted Combination Patent Claims

The District Court also enjoined Tile Tech to immediately surrender to UCP "all notched washers" made by Tile Tech and "any mold, or other device, by which any notched washer utilized with the Patent was made." This is overbroad because each of the asserted patent claims recites a combination of elements. Claim 1 is representative:

1. An elevated building surface assembly, comprising:
a plurality of horizontally disposed surface tiles, the surface tiles **comprising** *at least one top board* having a top surface, *at least two bottom rails supporting the top board*, an outer edge having a plurality

of corners, and a kerf disposed in the corners where the top board meets the bottom rails below the top surface of the top board, a bottom surface of the kerf being a top surface of a bottom rail; and

*a plurality of support pedestals*, the support pedestals being disposed beneath the corners of a plurality of adjacent surface tiles to vertically support and elevate the surface tiles above a fixed surface, the support pedestals comprising:

a base member, the base member comprising *a base plate* that is adapted to be placed upon a fixed surface, *a cylindrical base member extension* extending upwardly away from the base plate when the base member is operatively placed on a fixed surface, the base member extension comprising a base member extension cylindrical wall having *base member threads* disposed on a surface of the base member extension cylindrical wall;

a support member operatively attached to the base member, the support member comprising *a support plate* having a top surface and *a cylindrical support member extension* extending downwardly from the support plate, the support member extension comprising a support member extension cylindrical wall having *support member threads* disposed on a surface of the support member extension cylindrical wall, where the support member threads are adapted to threadably engage the base member threads to attach the support member to the base member and to adjust the height of the support pedestal when the support member is rotated relative to the base member;

*an anchoring washer having* a substantially circular outer perimeter and *a notch* intersecting the outer perimeter, the notch intersecting at least about 60 degrees and not more than about 130 degrees of the outer perimeter, wherein the anchoring washer is received within the kerfs of a plurality of the surface tiles; and

a fastener adapted to fasten the anchoring washer to the support plate to anchor the plurality of surface tiles to the support plate of the support pedestal.

(A46, col. 9, line 59 - col. 10, line 38) (emphasis added).

This claim thus requires a top board, two bottom "support" rails, a plurality of support pedestals having base plates, threaded cylindrical base member exten-

sions, support plates, threaded cylindrical support member extensions, and a "notched" anchoring washer, among other limitations. In order to infringe the '356 patent, therefore, an accused apparatus must have this combination of elements. The notched washer does not, in and of itself, infringe the '356 Patent. By extending the injunction to order the Tile Tech to surrender any remaining notched washers and the molds for making them -- a single element among the several elements recited in the combination claim -- the District Court far exceeded what UCP may be entitled to under patent law.

Since the District Court's injunction expanded UCP's patent rights beyond what is permitted by law, the injunction should be modified accordingly or vacated with the case being remanded.

### 3. The Lanham Act Portion of the Injunction Is Overbroad Since It Enjoins All Uses of Images of UCP's, Even Where There Would Be No Likelihood of Confusion

The District Court erred in enjoining Tile Tech, based on UCP's Lanham Act claim, from "using images of [UCP's] products, projects and drawings [in any] marketing materials," even if there is no likelihood of confusion.

The linchpin of trademark infringement is whether the use of a mark is likely to cause confusion:

> When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth.

Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 129 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); *see also*, Network Automation, Inc. v. Advanced Systems Concepts, Inc., 638 F.3d 1137, 1154 (Fed. Cir. 2011) ("Because the linchpin of trademark infringement is consumer confusion, the district court abused its discretion.").

Here, the District Court's injunction went far beyond what the Lanham Act permits by precluding all use of images of UCP's product. This would include legally permissible uses such as in comparative advertising or in other instances in which the image or the surrounding context would avoid any likelihood of confusion.

Since the District Court's injunction expanded UCP's rights beyond what is permitted by the Lanham Act, the injunction should modified accordingly or vacated with the case being remanded.

## VI.    REQUEST FOR REASSIGNMENT ON REMAND

Tile Tech requests this Court remand this case with an instruction to have the case on remand reassigned to a different judge. The Federal Circuit evaluates

requests to transfer to a different judge under the law of the regional circuit. Research Corp. Techs. v. Microsoft Corp., 536 F.3d 1247, 1255 (Fed. Cir. 2008). The Ninth Circuit considers the following three factors: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.  Id. (remanding with instructions to reassign, *citing*, 28 U.S.C. § 2106 and McCalden v. Cal. Library Ass'n, 955 F.2d 1214, 1224 (9th Cir.1990)).

This Court should therefore vacate and reverse the District Court's decision with an instruction to reassign the case on remand to a different judge in view of the District Court Judge's failure to fully consider Tile Tech's efforts to respond and supplement and failure to consider less drastic sanctions and to preserve the appearance of justice.

## VII.  <u>CONCLUSION</u>

The District Court's decision to grant entry of default judgment without applying the correct legal standard or considering the necessary factors was an abuse

34

of discretion requiring reversal.  The District Court failed to conduct the proper analysis, UCP did not suffer any prejudice as the case, even with a short continuance, would have remained relatively speedy, and the public had a strong interest in adjudicating a patent infringement action on the merits, to allow free competition with any idea that is not entitled to patent protection.  Moreover, the District Court failed to consider the availability of lesser sanctions, and the District Court admitted that the discovery violations were not attributed to any bad faith.  The lack of preparedness of Tile Tech's trial counsel, without bad faith, did not warrant this default judgment against Tile Tech, and exercising this drastic sanction without following the proper legal standard is an abuse of discretion requiring reversal.

In addition, the District Court's injunction should be vacated for exceeding the rights conferred by patent and trademark law.  This Court should therefore vacate and reverse the District Court's decision with an instruction to reassign the

///

///

///

///

///

///

///

case on remand to a different judge. *See, e.g.*, <u>Trimed, Inc., v. Stryker Corp.</u>, 608 F.3d 1333, 1344 (Fed. Cir. 2010) (remanding with instruction to reassign the case on remand to a different judge); and <u>Research Corp.</u>, 536 F.3d at 1255.

Dated: March 4, 2016                              Respectfully submitted,

                                        By:  /s/Kelly W. Cunningham
                                        Kelly W. Cunningham, Esq.
                                        CISLO & THOMAS LLP
                                        12100 Wilshire Blvd., Suite 1700
                                        Los Angeles, CA 90025-7103
                                        Phone: (310) 451-0647
                                        Fax: (310) 394-4477

                                        Attorneys for Appellant
                                        Tile Tech, Inc.

T:\15-31125\Opening brief for appeal.docx

## **PROOF OF SERVICE**

I served a copy of the foregoing on counsel of record on March 4, 2016, care

of the following mail and email address(es):

David von Gunten, Esq.                Michelle J. Correll, Esq.
Von Gunten Law LLC                    Smith Correll LLP
2696 S. Colorado Blvd., Suite 302     11766 Wilshire Blvd., Suite 1670
Denver, Colorado  80222               Los Angeles, California 90025
Email: dcvglaw@msn.com                Email: MCorrell@smithcorrell.com


including via the Electronic Court Filing (ECF) procedure provided by this Court.



Dated: March 4, 2016                  Respectfully submitted,


                                      By:  /s/Kelly W. Cunningham
                                      Kelly W. Cunningham, Esq.
                                      CISLO & THOMAS LLP
                                      12100 Wilshire Blvd., Suite 1700
                                      Los Angeles, CA 90025-7103
                                      Phone: (310) 451-0647
                                      Fax: (310) 394-4477

                                      *Attorneys for Appellant*
                                      *Tile Tech, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 7439 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point.

Dated: March 4, 2016                    Respectfully submitted,


By:  /s/Kelly W. Cunningham
Kelly W. Cunningham, Esq.
CISLO & THOMAS LLP
12100 Wilshire Blvd., Suite 1700
Los Angeles, CA 90025-7103
Phone: (310) 451-0647
Fax: (310) 394-4477

*Attorneys for Appellant*
*Tile Tech, Inc.*

# **ADDENDUM**

Patentee/Appellant attaches hereto a true and correct copy of

1. December 1, 2015 Default Judgment

2. December 1, 2015 Findings of Fact and Conclusions of Law

3. United States Patent No. 8,302,356

4. Table C-5, entitled, "U.S. District Courts -- Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2015," of the FEDERAL JUDICIAL CASELOAD STATISTICS 2015 TABLES, published online at:

http://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2015-tables

**ADDENDUM**

**EXHIBIT 1**

David von Gunten (*Pro Hac Vice*)
VON GUNTEN LAW LLC
2696 S. Colorado Blvd., Suite 302
Denver, Colorado 80222
Tel.: (303) 504-0055  Fax:  (303) 504-0044
dcvglaw@msn.com

Michelle J. Correll (Cal. Bar No. 229488)
SMITH CORRELL LLP
11766 Wilshire Blvd., Suite 1670
Los Angeles, CA 90025
Tel.: (213) 443-6222   Fax:  (877) 730-5910
mcorrell@smithcorrell.com

Attorneys for Plaintiff
United Construction Products, Inc.
d/b/a Bison Innovative Products

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNITED CONSTRUCTION PRODUCTS, INC. D/B/A BISON INNOVATIVE PRODUCTS <br><br> Plaintiff, <br><br> v. <br><br> TILE TECH, INC. <br><br> Defendant. | Case No. 2:14-CV-08570-R-VBK <br><br> Hon. Manuel L. Real, Courtroom 8 <br><br> **JUDGMENT** |

1.

**JUDGMENT**

A1

The Court, having GRANTED Plaintiff's Motion for Entry of Default Judgment, enters judgment as follows:

## I.     FIRST CLAIM FOR RELIEF (PATENT INFRINGEMENT)

Plaintiff's First Claim for Relief is for infringement by Defendant of a United States patent for a "Support Pedestal having an anchoring washer for securing elevated surface tiles," patent number 8,302,356, with a date of patent of November 6, 2012 (the "Patent").

Having found that Defendant has infringed upon the Patent; Defendant's infringement of the Patent is willful; and Defendant's infringement of the Patent has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law, IT IS HEREBY ORDERED AND ADJUDGED that:

(1)     Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of infringement of the Patent, including making, using, importing, selling, offering for sale, advertising, marketing or promoting the sale of any adjustable building surface support product incorporating the Patent, or any substantially similar adjustable building surface support product sold, advertised, marketed or promoted in the United States.

(2)     Defendant shall immediately surrender to Plaintiff any mold, or other device, by which any notched washer utilized with the Patent was made, and any and all notched washers made by Plaintiff.

(3)     Pursuant to 35 U.S.C. § 284 and/or § 285, Plaintiff is entitled to recover from Defendant its reasonable attorney's fees, costs and disbursements incurred in this action.

(4)     Plaintiff shall submit an affidavit or affidavits detailing its fees and

**JUDGMENT**
**A2**

costs within seven days of the date of entry of this Judgment detailing its attorney's fees and costs in order for the Court to determine the reasonable amount of the fees and costs to be awarded to Plaintiff.

## II. SECOND CLAIM FOR RELIEF (CONTRIBUTORY PATENT INFRINGEMENT)

Plaintiff's Second Claim for Relief is for contributory infringement by Defendant of the Patent.

Having found that Defendant knew or should have known that its activities infringed upon the Patent; Defendant sold or distributed products, which infringed upon the Patent, to others who have resold and/or used the products which infringed upon the Patent in the United States; the products which infringed upon the Patent are not a staple article of commerce and have no substantial non-infringing use; Defendant's conduct constitutes contributory patent infringement; and Defendant's conduct has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law, IT IS HEREBY ORDERED AND ADJUDGED that:

(1) Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of infringement of the Patent, including making, using, importing, selling, offering for sale, advertising, marketing or promoting the sale of any adjustable building surface support product incorporating the Patent, or any substantially similar adjustable building surface support product sold, advertised, marketed or promoted in the United States.

(2) Defendant shall immediately surrender to Plaintiff any mold, or other device, by which any notched washer utilized with the Patent was made, and any and all notched washers made by Plaintiff.

3.

(3)    Pursuant to 35 U.S.C. § 284 and/or § 285, Plaintiff is entitled to recover from Defendant its reasonable attorney's fees, costs and disbursements incurred in this action.

(4)    Plaintiff shall submit an affidavit or affidavits detailing its fees and costs within seven days of the date of entry of this Judgment detailing its attorney's fees and costs in order for the Court to determine the reasonable amount of the fees and costs to be awarded to Plaintiff.

## III.    THIRD CLAIM FOR RELIEF (INDUCED PATENT INFRINGEMENT)

Plaintiff's Third Claim for Relief is for induced infringement by Defendant of the Patent.

Having found that Defendant had actual knowledge of the Patent prior to the filing of this action; Defendant actively encouraged others to sell and/or use the products which infringed upon the Patent in the United States despite having knowledge of the Patent; Defendant did not have a good faith basis for its sales and offers to sell the products which infringed upon the Patent in the United States; Defendant's actions constitute inducement of infringement of the Patent; and Defendant's conduct has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law, IT IS HEREBY ORDERED AND ADJUDGED that:

(1)    Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of infringement of the Patent, including making, using, importing, selling, offering for sale, advertising, marketing or promoting the sale of any adjustable building surface support product incorporating the Patent, or any substantially similar adjustable building surface

**JUDGMENT**
**A4**

support product sold, advertised, marketed or promoted in the United States.

(2)     Defendant shall immediately surrender to Plaintiff any mold, or other device, by which any notched washer utilized with the Patent was made, and any and all notched washers made by Plaintiff.

(3)     Pursuant to 35 U.S.C. § 284 and/or § 285, Plaintiff is entitled to recover from Defendant its reasonable attorney's fees, costs and disbursements incurred in this action.

(4)     Plaintiff shall submit an affidavit or affidavits detailing its fees and costs within seven days of the date of entry of this Judgment detailing its attorney's fees and costs in order for the Court to determine the reasonable amount of the fees and costs to be awarded to Plaintiff.

## IV.   FOURTH CLAIM FOR RELIEF (UNFAIR COMPETITION)

Plaintiff's Fourth Claim for Relief is for unfair competition.

Having found that Defendant used images of Plaintiff's products, projects, and drawings on its website and through other marketing materials, thereby misrepresenting that such products, projects and drawings are the products, projects and drawings of Defendant; Defendant's use of images of Plaintiff's products, projects, and drawings, and representations that these goods and services belonged to, or are manufactured by Defendant is likely to deceive, mislead or cause confusion with prospective purchasers to the detriment of Plaintiff; Defendant has used the images of Plaintiff's products, projects and drawings in interstate commerce; Defendant's conduct violates Section 43(a) of the Lanham Act as well as the common law of unfair competition; and Defendant's conduct has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law, IT IS HEREBY ORDERED AND ADJUDGED that:

(1)     Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary

**JUDGMENT**

**A5**

entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of unfair competition, including using images of Plaintiff's products, projects and drawings on its website and in any other marketing materials.

(2)    Defendant shall immediately remove from is website or any of its marketing materials, images of Plaintiff's products, projects and drawings.

DATED: December 1, 2015         _____

                                Hon. Manuel L. Real
                                United States District Court Judge

6.

**JUDGMENT**

**A6**

**ADDENDUM**

**EXHIBIT 2**

David von Gunten (*Pro Hac Vice*)
VON GUNTEN LAW LLC
2696 S. Colorado Blvd., Suite 302
Denver, Colorado 80222
Tel.: (303) 504-0055  Fax:  (303) 504-0044
dcvglaw@msn.com

Michelle J. Correll (Cal. Bar No. 229488)
SMITH CORRELL LLP
11766 Wilshire Blvd., Suite 1670
Los Angeles, CA 90025
Tel.: (213) 443-6222   Fax: (877) 730-5910
mcorrell@smithcorrell.com

Attorneys for Plaintiff
United Construction Products, Inc.
d/b/a Bison Innovative Products

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| UNITED CONSTRUCTION PRODUCTS, INC. D/B/A BISON INNOVATIVE PRODUCTS | Case No. 2:14-CV-08570-R-VBK |
| | Hon. Manuel L. Real, Courtroom 8 |
| Plaintiff, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ENTRY OF JUDGMENT** |
| TILE TECH, INC. | |
| Defendant. | |

1.

THIS MATTER is before the Court on the Plaintiff's Complaint, the Answer to the Complaint filed by the Defendant, Plaintiff's Motion for Entry of Default Judgment, Defendant's response to such Motion, and Plaintiff's reply in support of such motion. The Motion for Entry of Default Judgment was heard by the Court on November 16, 2015.

THE COURT, having reviewed the pleadings, and considered the testimony, exhibits, arguments of counsel, and legal authority cited, makes the following findings of fact and conclusions of law, and enters judgment as follows:

## JURISDICTION AND VENUE

The Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338, because this action arises under the laws of the United States, including laws relating to patents, namely 35 U.S.C. § 271(a) (patent infringement), 35 U.S.C. § 271(b) (induced infringement), 35 U.S.C. § 271(c) (contributory patent infringement), and Section 43(a) – 15 U.S.C. 1125(a) – of the Lanham Act.

Venue is proper in this Court pursuant 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district.

## FINDINGS OF FACT

## I.     PROCEDURAL BACKGROUND

1.     Plaintiff filed its Complaint for Patent Infringement ("Complaint") against Defendant on January 31, 2014, in the United States District Court for the District of Colorado. [Dkt. No. 1], claiming infringement of a United States patent for a "Support Pedestal having an anchoring washer for securing elevated surface tiles," patent number 8,302,356, with a date of patent of November 6, 2012 (the "Patent"). The Court granted Plaintiff's Motion for Leave to Amend Complaint on October 19, 2015 [Dkt. No. 79], to which Motion Defendant never objected, and Defendant never filed an Answer to Plaintiff's First Amended Complaint. Plaintiff's First Amended Complaint is hereafter referred to as the "Complaint."

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ENTRY OF JUDGMENT**

**A8**

2. The Complaint, as amended, seeks relief for patent infringement, contributory patent infringement, induced infringement, and unfair competition. [Dkt. No. 66-4.]

3. On July 24, 2014, Defendant filed a Motion to Dismiss for Lack of Personal Jurisdiction in the United States District Court for the District of Colorado. [Dkt. No. 22.]

4. Certain limited discovery regarding the issue of personal jurisdiction took place over the next few months. *See* [Dkt. Nos. 30, 31, 32, 33, 34, and 35.]

5. The parties thereafter filed a Stipulation and Motion to Transfer Action to Central District of California. [Dkt. No. 38.]

6. An Order Transferring Action to Central District of California was entered on November 3, 2015 [Dkt. No. 39], the Central District of California entered a Notice of Receipt of Case Transferred on November 5, 2014 [Dkt. No. 41], and the case was assigned to this Court on November 5, 2014 [Dkt. No. 42].

7. Defendant filed its Answer to Plaintiff's Complaint on January 9, 2015. [Dkt. No. 50.]

8. The parties filed their Joint Report of Meeting Under Rule 26(f) on February 19, 2015. [Dkt. No. 55.]

9. The Court issued its Order (in Chambers) Setting Pre-Trial & Trial Dates on April 2, 2015, which set forth the following pertinent deadlines: A discovery cutoff date of October 19, 2015, and a trial date of December 8, 2015. [Dkt. No. 56.]

## II. <u>FACTUAL BACKGROUND</u>

10. On April 14, 2015, Plaintiff served on Defendant, by U.S. Mail, its first set of Requests for Admissions, Special Interrogatories, and Requests for Production ("Plaintiff's Discovery Request"). (Stipulation re Plaintiff's Motion to

Compel Further Responses to Written Discovery and Production of Documents, and for Sanctions ("Motion to Compel") [Dkt. No. 61, p. 6].)

11.    Defendant's Responses to Plaintiff's Discovery Request were due by May 18, 2015. (Motion to Compel [Dkt. No. 61, p. 6].)

12.    On May 21, 2015, counsel for Plaintiff contacted counsel for Defendant to inquire why no responses to Plaintiff's Discovery Request were received. (Motion to Compel [Dkt. No. 61, p. 7].)

13.    Defendant claimed it had not received Plaintiff's Discovery Request. (Motion to Compel [Dkt. No. 61, p. 7].)

14.    Although the service of Plaintiff's Discovery Request on Defendant was valid, Plaintiff agreed to allow Defendant an additional 20 days to respond to Plaintiff's Discovery Request. (Motion to Compel [Dkt. No. 61, p. 7].)

15.    Defendant requested extensions of time to respond to Plaintiff's Discovery Request and did not serve its responses to Plaintiff's Discovery Request until June 15, 2015. (Motion to Compel [Dkt. No. 61, p. 7].)

16.    Defendant's responses to Plaintiff's Discovery Request were deficient. (Motion to Compel [Dkt. No. 61, pp. 7-8].)

17.    Plaintiff therefore contacted Defendant on July 2, 2015, with a request to meet and confer regarding Defendant's deficient responses to Plaintiff's Discovery Request, and requested a response by July 15, 2015. (Motion to Compel [Dkt. No. 61, p. 8].)

18.    Defendant responded and proposed a meet-and-confer conference on July 17, 2015. (Motion to Compel [Dkt. No. 61, p. 8].)

19.    However, two hours before the meet-and-confer conference was to occur, Defendant requested that the conference be rescheduled for July 20, 2015. (Motion to Compel [Dkt. No. 61, p. 8].)

20.     Plaintiff agreed and provided a five-hour time frame during which the conference could take place on July 20, 2015.  (Motion to Compel [Dkt. No. 61, p. 8].)

21.     Defendant did not respond to Plaintiff until July 20, 2015, despite being reminded by Plaintiff, and again asked to reschedule, this time for July 21, 2015. (Motion to Compel [Dkt. No. 61, p. 8].)

22.     Plaintiff again agreed, proposing another time for the meet-and-confer conference on July 21, 2015. (Motion to Compel [Dkt. No. 61, p. 8].)

23.     Once again, Defendant did not promptly respond, but indicated it would contact Plaintiff later in the week.  (Motion to Compel [Dkt. No. 61, p. 8].)

24.     Plaintiff then warned Defendant that time was of the essence, and that a motion to compel would be filed if Defendant did not commit to a specific time and date for the meet-and-confer conference.  (Motion to Compel [Dkt. No. 61, p. 8].)

25.     Notwithstanding the warning, Defendant did not respond regarding setting a meet-and-confer conference until July 27, 2015. (Motion to Compel [Dkt. No. 61, p. 8].)

26.     The parties finally met for a meet-and-confer conference on July 28, 2015. (Motion to Compel [Dkt. No. 61, p. 9].)

27.     At the conference, Defendant agreed to supplement virtually every response to Plaintiff's Discovery Request, and to produce all responsive documents by August 7, 2015. (Motion to Compel [Dkt. No. 61, p. 9].)

28.     August 7, 2015, passed without Defendant serving any supplemental responses, or producing any documents. (Motion to Compel [Dkt. No. 61, p. 9].)

29.     Nevertheless, Plaintiff gave Defendant one final chance to adequately respond to Plaintiff's Discovery Request by April 17, 2015, before a motion to compel would be filed. (Motion to Compel [Dkt. No. 61, p. 9].)

5.

30.     Defendant ignored the final chance and failed to respond. (Motion to Compel [Dkt. No. 61, p. 9].)

31.     Plaintiff filed its Motion to Compel on August 26, 2015. [Dkt. No. 61.]

32.     Pursuant to Local Rule 37-3, Plaintiff invited Defendant to submit its position regarding its failure to adequately respond to Plaintiff's Discovery Request, but Defendant did not do so. (Motion to Compel [Dkt. No. 61, p. 9].)

33.     Defendant never filed an opposition or otherwise responded to Plaintiff's Motion to Compel.

34.     On September 3, 2015, Defendant served supplemental responses to the interrogatories and requests for admission contained within Plaintiff's Discovery Request. (Motion for Entry of Default Judgment Pursuant to the Court's October 5, 2015, Order ("Motion for Entry of Default Judgment") [Dkt. No. 73, attach. 1, p. 3].)[1]

35.     The supplemental responses were still deficient, and the interrogatories were unverified. (Motion for Entry of Default Judgment [Dkt. No. 73, attach. 1, pp. 3-4].)

36.     On September 24, 2015, Plaintiff informed Defendant that its supplemental responses to Plaintiff's Discovery Request were still deficient, the supplemental interrogatory responses were unverified, and that Defendant had failed to supplement its responses to Plaintiff's request for production contained within Plaintiff's Discovery Request.  (Motion for Entry of Default Judgment [Dkt. No. 73, attach. 1, p. 4].)

37.     The Court took the Motion to Compel under submission on September 29, 2015.  [Dkt. No. 68.]

---

[1]  The page numbers referenced for attachment 1 to Dkt. No. 73 refer to the page number of the pleading itself, and not to the page number electronically generated by the ECF system.

38.    On October 2, 2015, Defendant provided a supplemental response to Plaintiff's request for production contained within Plaintiff's Discovery Request, producing only two pages of documents, and finally provided a verification of its supplemental interrogatory responses.  (Motion for Entry of Default Judgment [Dkt. No. 73, attach. 1, p. 4].)

39.    Defendant's supplemental response to Plaintiff's request for production was deficient.  (Motion for Entry of Default Judgment [Dkt. No. 73, attach. 1, p. 5].)

40.    On October 5, 2015, the Court issued its Order Granting Plaintiff's Motion to Compel Further Responses to Written Discovery and Production of Documents, and for Sanctions ("Order to Compel").  [Dkt No. 72.]

41.    The Order to Compel found that the discovery responses of Defendant were "deficient," and that Defendant had employed "dilatory tactics" that were "a waste of this Court's time."  (Order to Compel [Dkt No. 72, p. 2].)

42.    The Order to Compel awarded sanctions in favor of Plaintiff and against Defendant in the amount of $4,024.50.  (Order to Compel [Dkt No. 72, p. 2].)

43.    Defendant has never paid the amount of sanctions awarded to Plaintiff. (Arguments of David von Gunten, counsel for Plaintiff, in open Court on November 16, 2015.)

44.    The Order to Compel ordered Defendant "to file a supplemental to each disputed interrogatory in good faith and to produce all documents requested not subject to valid objections by 10:00 A.M. October 12, 2015." (Order to Compel [Dkt No. 72, p. 2].)

45.    The Order to Compel further stated that "[i]n the event that Defendant does not comply with this Court's Order, *default judgment will be entered against it.*"  (Order to Compel [Dkt No. 72, p. 2] *(emphasis added)*.)

7.

46.     Defendant did not file any supplemental responses to Plaintiff's Discovery Request by 10:00 a.m. on October 12, 2015.

47.     Although Defendant claimed its counsel was unaware of the Order to Compel and its contents until after October 12, 2015 (Defendant's Opposition to Motion for Default Judgment [Dkt. No. 80-1, p. 7]), Defendant was specifically made aware of the Order to Compel on October 9, 2015, by Plaintiff's counsel. (Plaintiff's Reply in Support of Motion for Entry of Default Judgment Pursuant to the Court's October 5, 2015 Order ("Plaintiff's Reply for Entry of Default Judgment") [Dkt. No. 83, p. 8].)

48.     After 10:00 a.m. had passed with no response from Defendant, Plaintiff filed its Motion for Entry of Default Judgment on October 12, 2015. [Dkt. No. 73.]

49.     In Defendant's Opposition to Motion for Default Judgment ("Defendant's Opposition"), filed October 22, 2015, Defendant claimed it had served a third set of responses to Plaintiff's Discovery Request, and would provide additional responses to interrogatories based on information from a designated expert witness by November 1, 2015. [Dkt. No. 80-1, pp. 8-10.]

50.     Defendant's representations that it had served a third set of responses to Plaintiff's Discovery Request were a misrepresentation to the Court, because no third set of responses to Plaintiff's Discovery Request had been served on Plaintiff as of the filing of Defendant's Opposition.  (Plaintiff's Reply for Entry of Default Judgment,  [Dkt. No. 83, p. 9].)

51.     Defendant's claim that it would provide additional responses from a designated expert witness were facially insufficient and unjustified because the time period for Defendant to designate an expert witness had long passed as of the filing of Defendant's Opposition. (Plaintiff's Motion *in Limine* to Exclude Defendant's

8.

Exhibits 60 and 63 and the Testimony of Irving S. Rappaport. [Dkt. No. 91-1, p.3].)[2]

52.   Although Defendant had not disclosed any documents or tangible items in its initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1), and had only produced two documents in response to Plaintiff's Discovery Request, as of October 19, 2015, Defendant listed 15 exhibits on the parties' Joint Exhibit List that it sought to introduce at the trial of this matter.  (Plaintiff's Motion *in Limine* to Exclude Defendant's Exhibits 47-60 and 63. [Dkt. No. 89-1, p. 3].)[3]

53.   Further, although Defendant had not disclosed any persons with knowledge relevant to disputed facts its initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1), other than Ramin Tabibnia, as of October 19, 2015, Defendant listed 14 potential trial witnesses on its Witness List who had not been previously disclosed by Defendant.  (Plaintiff's Motion *in Limine* to Exclude All Fact Witnesses on Defendant's Witness List, Except for Ramin Tabibnia. [Dkt. No. 90-1, p. 3].)[4]

54.   Defendant finally served its third set of responses to the interrogatories and requests for admission contained within Plaintiff's Discovery Request on November 2, 2015.

55.   However, such supplemental responses contained significant and important information not previously produced or disclosed by Defendant, including but not limited to information regarding the existence of a mold device

---

[2]   The page numbers referenced for Dkt. No. 91-1 refer to the page number of the pleading itself, and not to the page number electronically generated by the ECF system.

[3]   The page numbers referenced for Dkt. No. 89-1 refer to the page number of the pleading itself, and not to the page number electronically generated by the ECF system.

[4]   The page numbers referenced for Dkt. No. 90-1 refer to the page number of the pleading itself, and not to the page number electronically generated by the ECF system.

1   used to make a notched washer, which is a critical element of the Patent.

2   (Arguments of David von Gunten, counsel for Plaintiff, in open Court on

3   November 16, 2015.)

4       56.     Previously, Plaintiff had stated in written discovery and deposition

5   testimony that the notched washer had been made by cutting plastic, and/or a three

6   dimensional printer, but as of November 2, 2015, claimed that a mold to make the

7   notched washer existed, which mold had never been produced.  (Arguments of

8   David von Gunten, counsel for Plaintiff, in open Court on November 16, 2015.)

9       57.     Defendant never produced any copies of the notched washer, because

10  Defendant claimed it had destroyed all of the notched washers it made when it

11  learned that Plaintiff had commenced this action.  (Arguments of Shahrooz

12  Tabibnia, counsel for Defendant in open Court on November 16, 2015; Plaintiff's

13  Motion for Spoliation Sanctions [Dkt No. 92-1, pp. 3-5].)[5]

14                      **CONCLUSIONS OF LAW**

15      58.     "Where a party so damages the integrity of the discovery process that

16  there can never be assurance of proceeding on the true facts, a case dispositive

17  sanction may be appropriate." *Connecticut Gen. Life Ins. Co. v. New Images of*

18  *Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007) (quoting *Valley Eng'rs v.*

19  *Electric Eng'g Co.*, 158 F.3d 1051, 1058 (9th Cir. 1998)).

20      59.     This case is such a case.  Defendant has so damaged the integrity of

21  the discovery process, as well as the litigation process itself, that a case dispositive

22  motion is appropriate.

23      60.     Defendant demonstrated a complete inability to comply with virtually

24  any deadline in this case, whether the deadline was set by agreement of the parties

25  or the Court. Defendant significantly delayed responding to discovery, meeting and

26

27  _____

[5]  The page numbers referenced for Dkt. No. 92-1 refer to the page number of the
pleading itself, and not to the page number electronically generated by the ECF
system.

28

conferring over discovery disputes, and supplementing discovery. Further, when Defendant actually responded to discovery, such responses were routinely, significantly, and unrelentingly, deficient. Most importantly, when the Court ordered Defendant to respond to Plaintiff's Discovery with supplemental responses by 10:00 a.m. on October 12, 2015, Defendant allowed the deadline to pass without any effort or comment. Defendant did so despite the Court's clear admonition that a failure to comply with the Order to Compel would result in entry of default judgment. The fact that additional supplementation of discovery was necessary is evidenced by Defendant providing further discovery responses, but not until November 2, 2015, and those responses provided information never before disclosed or produced.

61.     Defendant further demonstrated a lack of respect for virtually every other deadline in this case: Defendant sought to designate an expert well past the due date for designations, complaining in various pleadings that Plaintiff's expert designation was last minute, even though Defendant admitted the designation was timely (*see e.g.* Defendant Tile Tech, Inc.'s Ex Parte Application to Continue the Trial and Reopen Discovery [Dkt. No. 94-1, p.2]); Defendant did not respond to Plaintiff's Motion to Compel; Defendant did not object to Plaintiff's Motion to Amend Complaint, filed September 21, 2015, but later complained in various pleadings that the Motion to Amend was last minute (*see e.g.* Defendant Tile Tech, Inc.'s Ex Parte Application to Continue the Trial and Reopen Discovery [Dkt. No. 94-1, p.2]), and Defendant even failed to answer the amended Complaint.

62.     Defendant further failed to disclose or produce in response to discovery information regarding relevant witnesses and exhibits, but then sought to designate previously undisclosed witnesses and exhibits for trial.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ENTRY OF JUDGMENT**

**A17**

63.     Defendant also committed spoliation of evidence by admittedly destroying products which infringed the Patent, doing so after Defendant knew of the existence of this lawsuit.

64.     Such extremely abusive practices by Defendant, which were committed and sustained over the entire course of this action, damage the integrity of not only the discovery process, but also the orderly progress of litigation before this Court.  Such behavior makes it so there is no assurance that this matter can proceed to trial on the true facts.  Due to the fact that full, fair, and adequate discovery could not be obtained by Plaintiff, preventing any ability to determine damages with any precision, Plaintiff is entitled to an award of its reasonable attorney's fees and costs under the relevant statutes.

65.     The entry of judgment by default against the Defendant is therefore appropriate and authorized.

## ENTRY OF JUDGMENT

## I.     FIRST CLAIM FOR RELIEF (PATENT INFRINGEMENT)

66.     Plaintiff's First Claim for Relief is for infringement by Defendant of a United States patent for a "Support Pedestal having an anchoring washer for securing elevated surface tiles," patent number 8,302,356, with a date of patent of November 6, 2012 (the "Patent").

67.     Defendant has infringed upon the Patent.

68.     Defendant's infringement of the Patent is willful.

69.     Defendant's infringement of the Patent has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law.

70.     Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of infringement of the Patent,

including making, using, importing, selling, offering for sale, advertising, marketing or promoting the sale of any adjustable building surface support product incorporating the Patent, or any substantially similar adjustable building surface support product sold, advertised, marketed or promoted in the United States.

71.     Defendant shall immediately surrender to Plaintiff any mold, or other device, by which any notched washer utilized with the Patent was made, and any and all notched washers made by Plaintiff.

72.     Pursuant to 35 U.S.C. § 284 and/or § 285, Plaintiff is entitled to recover from Defendant its reasonable attorney's fees, costs and disbursements incurred in this action.

73.     Plaintiff shall submit an affidavit or affidavits detailing its fees and costs within seven days of the date of entry of this Judgment detailing its attorney's fees and costs in order for the Court to determine the reasonable amount of the fees and costs to be awarded to Plaintiff.

## II.     SECOND CLAIM FOR RELIEF (CONTRIBUTORY PATENT INFRINGEMENT)

74.     Plaintiff's Second Claim for Relief is for contributory infringement by Defendant of the Patent.

75.     Defendant knew or should have known that its activities infringed upon the Patent.

76.     Defendant sold or distributed products, which infringed upon the Patent, to others who have resold and/or used the products which infringed upon the Patent in the United States.

77.     The products which infringed upon the Patent are not a staple article of commerce and have no substantial non-infringing use.

78.     Defendant's conduct constitutes contributory patent infringement.

13.

79.     Defendant's conduct has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law.

80.     Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of infringement of the Patent, including making, using, importing, selling, offering for sale, advertising, marketing or promoting the sale of any adjustable building surface support product incorporating the Patent, or any substantially similar adjustable building surface support product sold, advertised, marketed or promoted in the United States.

81.     Defendant shall immediately surrender to Plaintiff any mold, or other device, by which any notched washer utilized with the Patent was made, and any and all notched washers made by Plaintiff.

82.     Pursuant to 35 U.S.C. § 284 and/or § 285, Plaintiff is entitled to recover from Defendant its reasonable attorney's fees, costs and disbursements incurred in this action.

83.     Plaintiff therefore shall submit an affidavit or affidavits detailing its fees and costs within seven days of the date of entry of this Judgment detailing its attorney's fees and costs in order for the Court to determine the reasonable amount of the fees and costs to be awarded to Plaintiff.

## III.     THIRD CLAIM FOR RELIEF (INDUCED PATENT INFRINGEMENT)

84.     Plaintiff's Third Claim for Relief is for induced infringement by Defendant of the Patent.

85.     Defendant had actual knowledge of the Patent prior to the filing of this action.

86. Defendant actively encouraged others to sell and/or use the products which infringed upon the Patent in the United States despite having knowledge of the Patent.

87. Defendant did not have a good faith basis for its sales and offers to sell the products which infringed upon the Patent in the United States.

88. Defendant's actions constitute inducement of infringement of the Patent.

89. Defendant's conduct has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law.

90. Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of infringement of the Patent, including making, using, importing, selling, offering for sale, advertising, marketing or promoting the sale of any adjustable building surface support product incorporating the Patent, or any substantially similar adjustable building surface support product sold, advertised, marketed or promoted in the United States.

91. Defendant shall immediately surrender to Plaintiff any mold, or other device, by which any notched washer utilized with the Patent was made, and any and all notched washers made by Plaintiff.

92. Pursuant to 35 U.S.C. § 284 and/or § 285, Plaintiff is entitled to recover from Defendant its reasonable attorney's fees, costs and disbursements incurred in this action.

93. Plaintiff therefore shall submit an affidavit or affidavits detailing its fees and costs within seven days of the date of entry of this Judgment detailing its attorney's fees and costs in order for the Court to determine the reasonable amount of the fees and costs to be awarded to Plaintiff.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ENTRY OF JUDGMENT**

**A21**

## IV.    **FOURTH CLAIM FOR RELIEF (UNFAIR COMPETITION)**

94.    Plaintiff's Fourth Claim for Relief is for unfair competition.

95.    Defendant used images of Plaintiff's products, projects, and drawings on its website and through other marketing materials, thereby misrepresenting that such products, projects and drawings are the products, projects and drawings of Defendant.

96.    Defendant's use of images of Plaintiff's products, projects, and drawings, and representations that these goods and services belonged to, or are manufactured by Defendant is likely to deceive, mislead or cause confusion with prospective purchasers to the detriment of Plaintiff.

97.    Defendant has used the images of Plaintiff's products, projects and drawings in interstate commerce.

98.    Defendant's conduct violates Section 43(a) of the Lanham Act as well as the common law of unfair competition.

99.    Defendant's conduct has caused and is continuing to cause irreparable injury to Plaintiff, and Plaintiff has no adequate remedy at law.

100.   Defendant, its agents, servants, officers, directors, employees, attorneys, privies, representatives, successors, assigns and parent and subsidiary entities, and any and all persons in act of concert or participation with any of them are permanently enjoined from any and all acts of unfair competition, including using images of Plaintiff's products, projects and drawings on its website and in any other marketing materials.

//

//

//

//

16.

101. Defendant shall immediately remove from is website or any of its marketing materials, images of Plaintiff's products, projects and drawings.

DATED: December 1, 2015

_____

Hon. Manuel L. Real
United States District Court Judge

17.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ADDENDUM**

**EXHIBIT 3**

(12) **United States Patent**

Knight, III et al.

(10) Patent No.: **US 8,302,356 B2**

(45) Date of Patent: **Nov. 6, 2012**

(54) **SUPPORT PEDESTAL HAVING AN ANCHORING WASHER FOR SECURING ELEVATED SURFACE TILES**

(75) Inventors: **Stephen J. Knight, III**, Littleton, CO (US); **William E. Kugler**, Denver, CO (US)

(73) Assignee: **United Construction Products, Inc.**, Denver, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 376 days.

(21) Appl. No.: **12/506,473**

(22) Filed: **Jul. 21, 2009**

(65) **Prior Publication Data**

US 2011/0016809 A1     Jan. 27, 2011

(51) **Int. Cl.**
**E04B 1/00**     (2006.01)
**E04B 5/00**     (2006.01)
**E04B 7/00**     (2006.01)

(52) **U.S. Cl.** .......................... **52/263**; 52/126.7; 52/139

(58) **Field of Classification Search** ...... 52/126.5–126.7, 52/263, 134, 137, 139
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 1,436,896 | A | * | 11/1922 | Newell | 404/40 |
| 1,614,127 | A | * | 1/1927 | Heppes | 52/311.2 |
| 1,888,937 | A | * | 11/1932 | Saives | 404/40 |
| 2,735,523 | A | | 2/1956 | Leyerle | 52/509 |
| 2,896,495 | A | * | 7/1959 | Crawford | 411/437 |
| 3,683,438 | A | * | 8/1972 | Tinnerman | 470/18 |
| 3,775,790 | A | * | 12/1973 | Tinnerman | 470/20 |
| 3,841,371 | A | * | 10/1974 | Thurston | 411/276 |
| 4,279,109 | A | | 7/1981 | Madl, Jr. | |
| 4,430,837 | A | * | 2/1984 | Kirschenbaum | 52/506.05 |
| 4,614,066 | A | * | 9/1986 | Koppenberg | 52/134 |
| 4,922,670 | A | * | 5/1990 | Naka et al. | 52/126.6 |
| 4,996,804 | A | | 3/1991 | Naka et al. | |
| 5,072,557 | A | * | 12/1991 | Naka et al. | 52/126.6 |
| 5,333,423 | A | * | 8/1994 | Propst | 52/126.6 |
| 5,588,264 | A | | 12/1996 | Buzon | |
| 5,624,200 | A | * | 4/1997 | Beaulieu | 403/217 |
| 5,953,865 | A | * | 9/1999 | Rickards | 52/139 |
| 6,363,685 | B1 | | 4/2002 | Kugler | |
| 6,402,415 | B1 | | 6/2002 | Eberle, III | |
| 6,463,704 | B1 | * | 10/2002 | Jette | 52/125.2 |
| 6,564,514 | B1 | * | 5/2003 | Rickards | 52/139 |
| 6,604,330 | B2 | | 8/2003 | Repasky | |
| 6,851,884 | B2 | | 2/2005 | Eberle | |
| 6,983,570 | B2 | | 1/2006 | Mead | |

(Continued)

OTHER PUBLICATIONS

Eternoivica Catalogue Price List, pp. 58-67, dated 2008.

(Continued)

*Primary Examiner* — Brian Glessner
*Assistant Examiner* — Adriana Figueroa
(74) *Attorney, Agent, or Firm* — Marsh Fischmann & Breyfogle LLP

(57) **ABSTRACT**

A support pedestal that is adapted to support surface tiles to form an elevated building surface. The support pedestal can include a base member that is adapted to be placed upon a fixed surface and a support plate that is disposed over the base member for supporting a surface tile. An anchoring washer is fastened to the support plate and anchors adjacent surface tiles to the support pedestal. The anchoring washers can be rotated to selectively disengage from at least one of the adjacent surface tiles. By rotating an anchoring washer in each corner of a surface tile to disengage the anchoring washers, the surface tile can be easily and rapidly removed from the building surface without necessitating the removal of adjacent surface tiles.

**19 Claims, 15 Drawing Sheets**



US 8,302,356 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,140,156 | B1 | 11/2006 | Lowe, Jr. et al. | |
| 7,168,212 | B2 * | 1/2007 | Jette | 52/220.5 |
| 7,413,371 | B2 * | 8/2008 | Arnold et al. | 403/353 |
| 7,647,732 | B2 * | 1/2010 | Rickards et al. | 52/139 |
| 7,770,345 | B2 * | 8/2010 | McConnell et al. | 52/263 |
| 7,874,113 | B2 | 1/2011 | Eberle, III | |
| 7,908,812 | B2 | 3/2011 | Eberle, III | |
| 7,918,059 | B2 * | 4/2011 | Repasky | 52/263 |
| 2002/0148173 | A1 * | 10/2002 | Kugler | 52/126.6 |
| 2004/0035064 | A1 | 2/2004 | Kugler et al. | |
| 2004/0261329 | A1 * | 12/2004 | Kugler et al. | 52/126.6 |
| 2010/0051763 | A1 | 3/2010 | Knight, III et al. | |
| 2011/0011012 | A1 | 1/2011 | Knight, III et al. | |
| 2011/0023385 | A1 | 2/2011 | Knight, III et al. | |

### OTHER PUBLICATIONS

Brochure entitled Exotic Wood Tile Installation, Bison Deck Supports, a United Construction Products, Inc. Company, dated Jun. 2007.

Ironwoods Elevated Deck Tile Systems with Hanover Pedestals, Website retrieved Jun. 12, 2009.

* cited by examiner



FIG.1



# FIG.2



FIG.3



FIG.4



FIG.5



FIG. 6



FIG. 7



FIG. 8



(a)



(b)

FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16

US 8,302,356 B2

# SUPPORT PEDESTAL HAVING AN ANCHORING WASHER FOR SECURING ELEVATED SURFACE TILES

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to the field of support pedestals for supporting an elevated surface above a fixed surface, such as for elevated floors, decks and walkways.

### 2. Description of Related Art

Elevated building surfaces such as elevated floors, decks, terraces and walkways are desirable in many environments. One common system for creating such surfaces includes a plurality of surface tiles, such as concrete tiles (pavers), stone tiles or wood tiles, and a plurality of spaced-apart support pedestals upon which the tiles are placed to be supported above a fixed surface. For example, in outdoor applications, the surface tiles may be elevated above a fixed surface by the support pedestals to promote drainage, to provide a level structural surface for walking, and/or to prevent deterioration of or damage to the surface tiles forming the building surface. The support pedestals can have a fixed height, or can have an adjustable height such as to accommodate variations in the contour of the fixed surface upon which the support pedestals are placed, or to create desirable architectural features.

In many applications the surface tiles are rectangular in shape, having four corners. Each of the spaced-apart support pedestals can therefore support the corners of four adjacent surface tiles at the tile corners. Stated another way, each surface tile can be supported by four support pedestals that are disposed under each of the four corners of the tile.

One example of a support pedestal is disclosed in U.S. Pat. No. 5,588,264 by Buzon, which is incorporated herein by reference in its entirety. The support pedestal disclosed by Buzon can be used in outdoor or indoor environments and is capable of supporting heavy loads applied by many types of building surfaces. The pedestal includes a threaded base member and a threaded support member that is rotatably engaged with the base member to enable the height of the support pedestal to be adjusted by rotating the support member or the base member relative to the other. The support pedestal can also include a coupling member that can couple the base member to the support member for further increasing the height of the support pedestal, if necessary.

Support pedestals are also disclosed in U.S. Pat. No. 6,363, 685 by Kugler and U.S. Patent Publication No. 2004/0261329 by Kugler et al., each of which is incorporated herein by reference in its entirety.

In some applications, the weight of the surface tiles is sufficient to keep the tiles safely supported by the pedestals. For example, concrete paver surface tiles can often be safely installed by simply placing the heavy pavers on the support pedestals. For less dense materials, such as wood or plastic, the surface tiles must typically be secured in some fashion to the support pedestals to prevent the tiles from moving in relation to adjacent tiles, or otherwise shifting on the support pedestals.

## SUMMARY OF THE INVENTION

One problem associated with some methods of securing lighter weight surface tiles, such as wooden deck tiles, to underlying support pedestals is that the deck surface must maintain an aesthetically acceptable appearance. However, some methods use fasteners that are visible on the deck surface, which consumers may consider unappealing.

Another problem associated with some methods is that the surface tiles are mounted to the support pedestals in a manner that can cause damage to the surface tiles when they are removed, such as for tile replacement or for access to the surface beneath the tiles.

Another problem associated with some methods of securing the tiles is that even if the surface tiles are removable after being secured to the support pedestals, a single tile that is in the middle of the structure (e.g., not on the perimeter of the elevated building surface) can only be removed by first removing at least one adjacent surface tile. As a result, it is often necessary to remove many surface tiles to access and remove one tile that is disposed away from the surface perimeter, i.e., in a central portion of the building surface.

It is therefore one objective to provide a support pedestal that can securely support a surface tile without substantially affecting the aesthetic qualities of the building surface. It is another objective to provide a support pedestal that enables the removal of a surface tile from a building surface in a rapid and convenient manner. Any one or more of these objectives may be met in accordance with one or more of the various embodiments disclosed herein.

In one embodiment, a support pedestal is provided that includes a base member that is adapted to be placed upon a fixed surface. A support plate is disposed over the base member and includes a top surface. An anchoring washer that can be fastened to the support plate is provided, where the anchoring washer can simultaneously anchor a plurality of surface tiles to the support pedestal. The anchoring washer may be particularly adapted to release a surface tile that is anchored to the support pedestal by the anchoring washer when the anchoring washer is rotated. In one aspect, the anchoring washer has an outer perimeter and a notch formed in a portion of the outer perimeter, whereby the anchoring washer can be rotated to move the notch to a desired position, e.g., to disengage from a selected surface tile.

In one aspect, the anchoring washer can include a centrally disposed aperture for receiving a fastener to fasten the anchoring washer to the support pedestal. The aperture can also include a slot that is adapted to receive a tool for rotating the anchoring washer to a desired position. For example, the slot can be adapted to receive the end of a flat-head screwdriver or a similar tool that can be inserted into the slot to rotate the anchoring washer to a desired position.

In another aspect, the anchoring washer is substantially circular. That is, a substantial portion of the perimeter of the anchoring washer can be circular. A minimum notch angle may be desirable to ensure that the corner of a surface tile can pass through the notch, while a maximum notch angle may be desirable to ensure that the anchoring washer is capable of simultaneously anchoring a plurality of surface tiles on the support pedestal. In this regard, the notch can intersect at least about 60° of the anchoring washer perimeter and in another aspect intersects no more than about 130° of the washer perimeter, such as at least about 80° and not more than about 120° of the washer perimeter.

According to another aspect, a plurality of tile spacers extend upwardly from the top surface of the support plate, such as where the spacers are disposed on a crown member that is placed on the top surface. In another aspect, the support pedestal is a height-adjustable support pedestal. In another aspect, the support plate is disposed on a support member that is operatively attached to the base member. For example, the base member can include a cylindrical base member extension that extends upwardly when the base member is operatively placed on a fixed surface, where the base member extension includes base member threads. The support mem-

US 8,302,356 B2

3

ber can include a cylindrical support member extension that extends downwardly from the support plate and that is threadably attached to the base member extension, such as by being directly attached to the base member extension or by being attached to the base member extension using a coupling member disposed between the base member and the support member.

According to another embodiment, a support pedestal is provided that has an adjustable height. The support pedestal can include a base member having a base plate that is adapted to be placed upon a fixed surface, and a cylindrical base member extension having a cylindrical wall and extending upwardly from the base plate when the base member is operatively placed on the fixed surface. The cylindrical wall can include base member threads disposed on a surface of the wall. A support member is operatively attached to the base member, the support member having a cylindrical support member extension and a support plate having a top surface. The support member extension can include a cylindrical wall and support member threads disposed on a surface of the support member extension cylindrical wall, where the support member threads are adapted to threadably engage the base member threads, for example, to attach the support member to the base member and/or to adjust the height of the support pedestal. An anchoring washer is fastened to the support plate, the anchoring washer having an outer perimeter and a notch formed in a portion of the outer perimeter, the notch intersecting at least about 60° and not greater than about 130° of the washer perimeter.

In one aspect, the anchoring washer is fastened to the support plate with a threaded fastener. According to another aspect, the support pedestal also includes a coupling member that is coupled to the base member and the support member to operatively attach the support member to the base member.

According to another embodiment, an elevated building surface assembly is provided. The assembly can include a plurality of surface tiles supported and elevated by a plurality of support pedestals. The surface tiles can each include an outer edge that includes a plurality of corners with a kerf disposed in the corners. The support pedestals vertically support and elevate the surface tiles above a fixed surface, and the support pedestals include a support plate having a top surface for supporting the tiles, and an anchoring washer spaced apart from the top surface and fastened to the support plate by a fastener. The anchoring washers are disposed within the kerfs of adjacent surface tiles to anchor the surface tiles to the support pedestals. Further, the anchoring washers may be rotated to selectively disengage a surface tile from the support pedestal. For example, the anchoring washers can be substantially circular and can include a notch in an outer perimeter of the washers. When the notch is aligned with a corner of a selected surface tile, that surface tile can then be disengaged from the support pedestal.

According to one aspect, the anchoring washer includes a centrally disposed aperture for receiving a fastener, and a slot that is adapted to receive a tool for rotating the anchoring washer. According to another aspect, the surface tiles are selected from wooden surface tiles, plastic surface tiles and wood-plastic composite surface tiles. For example, the surface tiles can include at least one top board and at least two bottom rails supporting the top board, wherein the kerfs are generally disposed in an outer edge between the top board and the bottom rail. The support pedestals can have an adjustable height, and in one aspect the support pedestals include a base member that is adapted to be placed upon a fixed surface, where the base member includes a base member extension that extends upwardly when the base member is operatively

4

placed on the fixed surface. A support member having a support member extension may be threadably attached to the base member extension.

According to another embodiment, a method for the construction of an elevated building surface assembly is provided. The method may include the step of placing a plurality of support pedestals upon a fixed surface with a predetermined spacing between the support pedestals. The elevated building surface assembly is constructed by placing surface tiles onto the support pedestals. In this regard, particularly with rectangular surface tiles, a corner of each of three surface tiles can be placed upon one of the support pedestals to partially support the three surface tiles. Other portions of the surface tiles can be supported by other support pedestals, as is desired. An anchoring washer is inserted into adjacent kerfs that are disposed in the corners of each of the three surface tiles above the support pedestals. A fourth surface tile can then be placed onto the support pedestal, such as where the fourth surface tile also includes a kerf disposed in the corner of the fourth surface tile. The anchoring washer can be rotated to a position that is adapted to anchor the four surface tiles to the support pedestal, and the anchoring washer can be secured to the support pedestal to anchor the surface tiles to the support pedestal.

To remove one of the surface tiles from the support pedestal, the anchoring washer can be loosened by rotating the anchoring washer to a position that releases one of the surface tiles from the support pedestals. The rotating steps can include inserting a tool into a slot that is disposed in the washer and rotating the anchoring washer using the tool.

These and other embodiments and aspects of support pedestals, building surface assemblies and methods for the construction of building surface assemblies will be apparent from the following description.

## DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a perspective view of a portion of an elevated building surface assembly.

FIG. **2** illustrates a perspective view of a support pedestal.

FIG. **3** illustrates an exploded side view of a support pedestal.

FIG. **4** illustrates an exploded cross-sectional view of a support pedestal.

FIG. **5** illustrates a side view of an assembled support pedestal.

FIG. **6** illustrates a partial perspective view of a surface tile having a kerf disposed in a corner of the surface tile.

FIG. **7** illustrates a partial perspective view of a pedestal support supporting adjacent surface tiles in an elevated building surface assembly.

FIG. **8** illustrates a partial perspective view of adjacent surface tiles including a kerf disposed in a corner of each of the surface tiles.

FIGS. **9***a* and **9***b* illustrate an anchoring washer having a notch in the outer perimeter of the anchoring washer.

FIG. **10** illustrates a partial perspective view of an elevated building surface assembly.

FIG. **11** illustrates a partial perspective view of an elevated building surface assembly.

FIG. **12** illustrates a partial top view of an elevated building surface assembly.

FIG. **13** illustrates a partial side view of a support pedestal supporting surface tiles in an elevated building surface assembly.

5

6

FIG. **14** illustrates a partial top view of an elevated building surface assembly where an anchoring washer is rotated to disengage a surface tile.

FIG. **15** illustrates a top view of an elevated building surface assembly where a plurality of anchoring washers are rotated to disengage a surface tile.

FIG. **16** illustrates a perspective view of a surface tile being removed from an elevated building surface assembly.

DESCRIPTION OF THE INVENTION

FIG. **1** illustrates an elevated building surface assembly **100**. The surface assembly **100** includes a plurality of support pedestals **101** and a building surface **103** including a plurality of surface tiles **102** disposed on and supported by the support pedestals **101**. The support pedestals **101** support and elevate the surface tiles **102** above a fixed surface to form the elevated building surface **103**. The tiles **102** can comprise virtually any material that is used for building surfaces, particularly relatively lightweight materials. For example, the tiles can be wooden tiles, particularly hardwood tiles that are commonly used for outdoor deck surfaces. The surface tiles **102** can also comprise a plastic material, such as plastics that are utilized for outdoor deck surfaces that are resistant to rot and corrosion. Composite materials such as wood-plastic composites can also be utilized. As illustrated in FIG. **1**, the surface tiles **102** each include at least two bottom rails **122** and a plurality of top boards **120** that are attached to and supported by the bottom rails **122** to form the surface tile **102**. The surface tiles **102** can have virtually any shape such as a rectangular shape, a triangular shape, octagonal shape, or others, and can be fabricated in a variety of configurations, including metal or fiberglass grating, or the like.

The support pedestals **101** can be placed in a spaced-apart relationship on fixed surfaces including, but not limited to, rooftops, on-grade (e.g., natural ground), over concrete slabs including cracked concrete slabs, and can be placed within water features, such as fountains. The elevated building surface assembly **100** can be used for both interior and exterior applications. Each of the surface tiles **102** is placed upon several support pedestals **101** to elevate the surface tiles **102** above the fixed surface. As illustrated in FIG. **1**, the surface tiles **102** are square and a support pedestal **101** is disposed beneath four proximate corners of adjacent surface tiles **102** that form the elevated building surface **103**. Further, although illustrated in FIG. **1** as being laid out in a symmetric square pattern, the support pedestals **101** can also be laid out in various configurations as may be dictated by the shape and size of the surface tiles.

FIG. **2** illustrates a support pedestal **101** that is useful for supporting surface tiles in an elevated building surface assembly. The support pedestal **101** includes a base member **104** having a base plate **105** that is adapted to be placed upon a fixed surface. A support member **106** is disposed over the base member **104** and is operatively attached to the base member **104**. In this regard, the support member **106** is threadably attached directly to the base member **104**. The support member **106** includes a support plate **108** having a top surface **110**. A plurality of spacers **112** extend upwardly from the top surface **110** of the support plate **108** for providing predetermined spacing between adjacent surface tiles. Although illustrated as including a support member **106** that can be separated from the base member **104**, the support pedestal can include a base member having a support plate that is integrally formed with the base member, e.g., a unitary one-piece support pedestal.

FIGS. **3-5** illustrate another exemplary embodiment of a support pedestal **101** including an optional coupling member. FIG. **3** illustrates an exploded side view of the support pedestal, FIG. **4** illustrates an exploded cross-sectional view of the support pedestal and FIG. **5** illustrates a side view of the assembled support pedestal. The support pedestal illustrated in FIGS. **3-5** is a height adjustable support pedestal that enables the height of the surface tiles above the fixed surface to be adjusted, for example to accommodate variations in the elevation of the fixed surface and/or to create architectural features.

The support pedestal **101** includes a base member **104** that is adapted to be placed upon a fixed surface, such as by placing the base member plate **105** on a fixed surface. The base member **104** includes a cylindrical base member extension **107** that extends upwardly from the base member plate **105** when the support pedestal **101** is operatively placed on the fixed surface. The cylindrical base member extension **107** includes a cylindrical base member extension wall **136** and base member threads **138** disposed on an outer surface of the base member extension wall **136**.

A support member **106** is adapted to be operatively connected to the base member **104** and includes a top support plate **108** having a top surface **110**. A cylindrical support member extension **109** extends downwardly from the support plate **108**. The support member extension **109** includes a cylindrical wall **111** having support member threads **113** disposed on an interior surface of the cylindrical wall **111**. The support member threads **113** can be adapted to threadably engage the base member threads **138** to connect the support member **106** to the base member **104**.

As illustrated in FIGS. **3-5**, the support pedestal **101** also includes a coupling member **114** that is adapted to increase the height of the support pedestal **101**. The coupling member **114** includes a first cylindrical portion **121** that is adapted to slidably engage with the base member extension **107**. The coupling member **114** also includes a second cylindrical portion **127** that includes coupling member threads **117** that are adapted to rotatably engage with the support member threads **113**. It is important to note that the timing of the coupler member threads **117** with the base member threads **138** should be synchronized when the coupling member **114** is placed in the base member **104**. As a result, the support member threads **113** can fully engage the coupling member threads **117** and continue to thread onto the base member threads **138** without binding. In this way, the support pedestal **101** can be fully adjusted through a wide range of heights without any gaps in the obtainable pedestal height. In the embodiment illustrated in FIGS. **3-5**, the coupling member **114** also includes an alignment member **140***a* that is adapted to mate with an alignment member **140***b* in the base member **104** to insure the timing of the coupling member threads **117** with the base member threads **138**.

Thus, the coupling member **114** can engage both of the support member **106** and the base member **104** to couple the support member **106** to the base member **104** and provide an increased height for the support pedestal **101**.

The support pedestal **101** can also include tile spacers **112** that are adapted to provide predetermined spacing for the surface tiles that are placed on the support pedestal **101**. In this regard, the tile spacers **112** can project upwardly from the top support surface **110**. As illustrated in FIG. **3-5**, the tile spacers **112** are provided on a crown member **115** that is adapted to be placed in a recess **129** on the top support surface **110**. In this manner, the crown member **115** can be freely rotated in relation to the support member **106** to accommodate the positioning of the surface tiles.

US 8,302,356 B2

7

As is discussed above, an anchoring washer is utilized to anchor one or more surface tiles to a support pedestal. It is generally desirable that the anchoring washer be wholly or partially obstructed from view when observed from the top of the building surface so that the building surface maintains an aesthetically pleasing appearance. In this regard, the anchoring washer can be positioned below the top of the building surface, such as within one or more kerfs that are disposed in an outer edge of a surface tile, such as at the corner of a surface tile.

FIG. 6 illustrates a perspective view of a corner of a surface tile 102. The surface tile 102 includes a plurality of top boards 120 that are supported by and attached to a bottom rail 122. It will be appreciated that a bottom rail such as bottom rail 122 can be included along two opposite sides of the surface tile 102, or can be disposed around the entire perimeter of the surface tile 102. Further, the surface tile 102 could comprise a single unitary panel, such as one having one or more kerfs disposed in the edges of the tile.

The surface tile 102 has an outer edge 116 around the perimeter of the surface tile 102. As illustrated in FIG. 6, the outer edge 116 of the surface tile 102 is defined by outer edges of the bottom rail 122 and outer edges of the top boards 120.

A kerf 118 is disposed in the outer edge 116, particularly in a corner of the outer edge 116 of the surface tile 102. As illustrated in FIG. 6, the kerf 118 is formed by a cut in the bottom rail 122. The kerf 118 could also be formed wholly or partially in the top board 120, or at any location in the outer edge 116 between the top surface 123 of the top board 120 and the bottom surface of the bottom rail 122. It should be noted that when an anchoring washer is placed within the kerf 118, as is discussed in more detail below, the anchoring washer will be at least partially obstructed from the view of an observer by the top board 120.

In constructing an elevated building surface assembly, a plurality of surface tiles, such as four surface tiles, are placed upon each support pedestal such that each of the four corners of a surface tile is supported by a support pedestal. FIG. 7 illustrates three surface tiles 102a-102c that are disposed upon a support pedestal 101, such as during construction of an elevated building surface. The support pedestal 101 supports a corner of each of the three surface tiles 102a-102c. As illustrated in FIG. 7, the bottom rails 122 of the tiles 102a-102c are placed upon the top of the support pedestal 101. Outer edges 116 of the tiles 102a-102c are disposed immediately adjacent to one another.

In this regard, FIG. 8 illustrates a perspective view of three adjacent surface tiles 102a-102c with the support pedestal removed for purposes of illustration. A kerf is formed in an outer edge of each of the tiles 102a-102c. The tiles 102a-102c each include bottom rails 122 and a plurality of top boards 120 attached to and supported by the bottom rails 122 to form the surface tiles 102a-102c. In the embodiment illustrated in FIG. 8, the kerfs are disposed in a corner of each outer edge (e.g., outer edges 119a and 119c) between the bottom rail 122 and the top boards 120. When assembled in this manner, the kerfs are disposed in proximal relation to form a cavity 134 that is adapted to receive an anchoring washer therein to anchor the surface tiles to a support pedestal.

FIGS. 9a-9b illustrate an anchoring washer 124 for anchoring surface tiles to a support pedestal. The anchoring washer 124 includes an outer perimeter 125 and a notch 126 formed in a portion of the outer perimeter. As illustrated in FIG. 9a-9b, the washer 124 has a substantially circular shape, i.e., the portion of the washer not intersected by the notch 126 has a substantially constant radius. To enable the corner of a surface tile to be removed from a support pedestal by lifting

8

the corner through the notch 126, described in more detail below, the notch 126 can intersect the perimeter of the washer by at least about 60°, at least about 80°, or at least about 90°, such as at least about 95°. To ensure that the anchoring washer is able to simultaneously anchor each tile (e.g., four tiles) to the support pedestal, the notch should intersect not more than about 130° of the washer perimeter, such as not more than about 125°, not more than about 120°, or not more than about 115° of the washer perimeter. For example, the notch 126 illustrated in FIGS. 9a-9b intersects the perimeter 125 by about 105°.

A fastener 132, such as a threaded fastener, can be inserted through the anchoring washer 124 to secure the washer 124 to the support pedestal, such as to the top support plate. The fastener 132 can be a fastener that is easily removable and replaceable. Both the fastener 132 and the washer 124 can be fabricated from a material that is resistant to corrosion, such as plastic. Other types of fasteners may be utilized to operatively fasten the anchoring washer to the support plate, including for example pop rivets or molly bolts.

The anchoring washer 124 can also include an aperture 128 having a centrally disposed slot 130. The slot 130 may be adapted to receive a tool, such as a flat head screwdriver, for rotating the washer 124. In this manner, the rotational position of the notch 126 in relation to the tiles can be changed to anchor and/or release selected tiles from a support pedestal. The slot 130 is particularly advantageous since the anchoring washer 124 is disposed within the kerfs and when the building surface is assembled, access to the washer 124 is limited to the central portion of the washer.

FIG. 10 illustrates a perspective view of the placement of an anchoring washer 124 to anchor surface tiles 102 to a support pedestal 101. After placement of three tiles 102a-102c on the support pedestal 101, the washer 124 can be inserted into a cavity 134 formed by kerfs in the edges 122 of the surface tiles. After placement of the washer 124 within the cavity 134, the fastener 132 can be placed through the washer 124 and fastened to the support plate 108 of the support pedestal 101.

Referring to FIG. 11, after placement of the anchoring washer 124 into the cavity formed by the kerfs of the three surface tiles 102a-102c, a fourth surface tile 102d can be placed onto the support pedestal 101. As illustrated in FIG. 11, the anchoring washer can optionally be rotated so that the notch is fully exposed in the direction of the fourth surface tile 102d. In this manner, the surface tile 102d can be placed on the support pedestal 101 by passing a corner of the surface tile 102d through the notch to place the surface tile 102d onto the support pedestal 101. After placement of the fourth surface tile 102d, the anchoring washer can be partially rotated, such as through an angle of about 50° to 60°, such that the anchoring washer is disposed within the kerf of each of the four surface tiles 102a-102d. Thereafter, the anchoring washer can be secured to the support pedestal 101 by tightening the fastener. As a result, all four surface tiles 102 will be securely anchored to the support pedestal 101 by the compression of the surface tile between the anchoring washer and the top surface of the support pedestal 101.

Although described as being passed through the notch of the anchoring washer during construction, it will be appreciated that the fourth surface tile 102d can be placed onto the support in any manner of ways. For example, the anchoring washer can be rotated to its anchoring position so that a portion of the anchoring washer is exposed, and the fourth surface tile 102d can be slid onto the top surface of the support pedestal 101 such that the anchoring washer is laterally inserted into the kerf of the support tile 102d. Thereafter, the

US 8,302,356 B2

9     10

anchoring washer can be further tightened to anchor the surface tiles to the support pedestal **101**, if necessary.

FIG. **12** illustrates a top view of an elevated building surface assembly where an anchoring washer **124** anchors each of the four surface tiles **102***a***-102***d* to the support pedestal (not illustrated). As can be seen from FIG. **12**, the anchoring washer **124** is rotated to a position such that at least a portion of the anchoring washer **124** is disposed within the kerf of each of the four surface tiles **102***a***-102***d*. The four surface tiles **102***a***-102***d* are thereby securely anchored to the support pedestal. A gap between adjacent surface tiles provides access to the fastener and the anchoring washer, while substantially obscuring the fastener and anchoring washer from view.

FIG. **13** illustrates a partial cross-section of surface tiles **102***a* and **102***b* anchored to a support pedestal **101**. For purposes of illustration, the surface tiles **102***a* and **102***b*, the anchoring washer **124** and the fastener **132** are shown in cross-section. As is illustrated in FIG. **13**, the anchoring washer **124** is disposed within the kerfs **118** of each of the surface tiles **102***a* and **102***b*. The fastener **132** is disposed through an aperture in the anchoring washer **124** and is threadably engaged with the support plate **108** of the support pedestal **101**. Access to the threaded fastener **132** and the anchoring washer **124** is provided by a gap **142** that is formed between the top boards **120** of adjacent surface tiles **102**.

It is a particular advantage that the surface tiles **102** can be rapidly and conveniently removed from the elevated building surface assembly, such as to replace a defective surface tile or to access the space beneath a surface tile. FIG. **14** illustrates a top view of a portion of an elevated building surface assembly **100**. As illustrated in FIG. **14**, the anchoring washer **124** is rotated such that the notch **126** is in a position to disengage from the corner of the surface tile **102**. That is, the anchoring washer **124** is no longer disposed within the kerf of the surface tile **102**. This disengages the anchoring washer **124** from the surface tile **102***d* and can advantageously permit the surface tile **102***d* to be removed from the building surface assembly **100** without disturbing the adjacent tiles **102***a***-102***c*.

In this regard, FIG. **15** illustrates a top view of an elevated building surface assembly where the support washers **124***a***-124***d* in each corner of a surface tile **102***d* have been rotated to the position illustrated by FIG. **14**. As can be seen from FIG. **15**, the surface tile **102** is no longer anchored to a support pedestal due to the rotation of the anchoring washers **124***a***-124***d*. FIG. **16** illustrates the surface tile **102***d* being removed from the building surface **103**. It is a particular advantage that a centrally disposed surface tile **102***d* can be removed from and/or inserted into the building surface **103** without requiring any adjacent surface tiles to be removed from the building surface assembly **100**.

While various embodiments of the present invention have been described in detail, it is apparent that modifications and adaptations of those embodiments will occur to those skilled in the art. However, is to be expressly understood that such modifications and adaptations are within the spirit and scope of the present invention.

What is claimed is:

**1**. An elevated building surface assembly, comprising:

a plurality of horizontally disposed surface tiles, the surface tiles comprising at least one top board having a top surface, at least two bottom rails supporting the top board, an outer edge having a plurality of corners, and a kerf disposed in the corners where the top board meets the bottom rails below the top surface of the top board, a bottom surface of the kerf being a top surface of a bottom rail; and

a plurality of support pedestals, the support pedestals being disposed beneath the corners of a plurality of adjacent surface tiles to vertically support and elevate the surface tiles above a fixed surface, the support pedestals comprising:

a base member, the base member comprising a base plate that is adapted to be placed upon a fixed surface, a cylindrical base member extension extending upwardly away from the base plate when the base member is operatively placed on a fixed surface, the base member extension comprising a base member extension cylindrical wall having base member extension threads disposed on a surface of the base member extension cylindrical wall;

a support member operatively attached to the base member, the support member comprising a support plate having a top surface and a cylindrical support member extension extending downwardly from the support plate, the support member extension comprising a support member extension cylindrical wall having support member threads disposed on a surface of the support member extension cylindrical wall, where the support member threads are adapted to threadably engage the base member threads to attach the support member to the base member and to adjust the height of the support pedestal when the support member is rotated relative to the base member;

an anchoring washer having a substantially circular outer perimeter and a notch intersecting the outer perimeter, the notch intersecting at least about 60 degrees and not more than about 130 degrees of the outer perimeter, wherein the anchoring washer is received within the kerfs of a plurality of the surface tiles; and

a fastener adapted to fasten the anchoring washer to the support plate to anchor the plurality of surface tiles to the support plate of the support pedestal.

**2**. An elevated building surface assembly as recited in claim **1**, wherein the fastener is a threaded fastener and wherein the anchoring washer comprises a centrally disposed aperture for receiving the threaded fastener, the aperture comprising a slot adapted to receive a tool for rotating the anchoring washer.

**3**. An elevated building surface assembly as recited in claim **1**, further comprising a coupling member that is engaged with the base member and the support member to operatively attach the support member to the base member.

**4**. An elevated building surface assembly as recited in claim **1**, wherein only a single notch intersects the outer perimeter of the anchoring washer.

**5**. An elevated building surface assembly, comprising:

a plurality of surface tiles, the surface tiles comprising:

at least one board having a top surface;

at last two bottom rails supporting the top board;

an outer edge having a plurality of corners; and

a kerf disposed in the corners where the top board meets the bottom rails and below the top surface of the top board, a bottom surface of the kerf being a top surface of the bottom rail, and wherein the surface tiles are selected from wooden surface tiles, plastic surface tiles and wood-plastic composite surface tiles;

a plurality of support pedestals, the support pedestals being disposed beneath the corners of a plurality of adjacent surface tiles to vertically support and elevate the surface tiles above a fixed surface, the support pedestals comprising:

US 8,302,356 B2

11

a support plate having a top surface for supporting the surface tiles, and

an anchoring washer spaced apart from the top surface and being fastened to the support plate by a fastener, where the anchoring washers are disposed within the kerfs of adjacent surface tiles and below the top surface of the surface tiles to anchor the surface tiles to the support pedestals, and wherein the anchoring washers can be rotated to selectively disengage a surface tile from a support pedestal.

**6**. An elevated building surface assembly as recited in claim **5**, wherein the anchoring washer comprises a centrally disposed aperture for receiving the fastener, the aperture comprising a slot adapted to receive a tool for rotating the anchoring washer.

**7**. An elevated building surface assembly as recited in claim **5**, wherein the surface tiles comprise at least four corners.

**8**. An elevated building surface assembly as recited in claim **5**, wherein the anchoring washers comprise an outer perimeter and a notch intersecting the outer perimeter of the anchoring washer.

**9**. An elevated building surface assembly as recited in claim **8**, wherein the notch intersects at least about 60 degrees of the outer perimeter of the anchoring washer.

**10**. An elevated building surface assembly as recited in claim **8**, wherein the notch intersects not greater than about 130 degrees of the outer perimeter of the anchoring washer.

**11**. An elevated building surface assembly as recited in claim **5**, wherein the support pedestals have an adjustable height.

**12**. An elevated building surface assembly as recited in claim **11**, wherein the support pedestals comprise:

a base member that is adapted to be placed upon a fixed surface, the base member comprising a base member extension that extends upwardly when the base member is operatively placed fixed surface, and

a support member comprising a support member extension that is threadably attached to the base member extension.

**13**. An elevated building surface assembly as recited in claim **12**, wherein the support pedestals further comprise a coupling member that is engaged with the base member and the support member to attach the support member to the base member.

12

**14**. An elevated building surface assembly as recited in claim **5**, wherein the surface tiles are triangular.

**15**. An elevated building surface assembly as recited in claim **5**, wherein the surface tiles are rectangular.

**16**. An elevated building surface assembly as recited in claim **5**, wherein the fixed surface consists of a substantially horizontal fixed surface selected from the group of a rooftop, on-grade, natural ground, and a concrete slab.

**17**. A method for the construction of a substantially horizontal structural building surface assembly, comprising the steps of:

placing a plurality of support pedestals over a fixed surface with a predetermined spacing between the support pedestals, the fixed surface consisting of at least one selected from the group of a rooftop, on-grade, natural ground, and a concrete slab;

placing a bottom surface of a corner of each of three surface tiles upon a top surface of one of the support pedestals whereby the top surface partially vertically supports the three surface tiles in horizontally-spaced relation;

inserting an anchoring washer into adjacent kerfs that are disposed in the corners of each of the three surface tiles;

placing the bottom surface of a corner of a fourth surface tile on the top surface of the support pedestal whereby the top surface partially vertically supports the fourth surface tile;

rotating, after the inserting step, the anchoring washer to a position that is adapted to anchor the four surface tiles to the support pedestal;

inserting a fastener through the anchoring washer; and

securing the fastener to the support pedestal to anchor the surface tiles to the support pedestal,

wherein the surface tiles comprise at least one top board having a top surface and at least two bottom rails supporting the top board, wherein the kerfs are disposed in the corners where the top board meets the bottom rails below the top surface of the top board, a bottom surface of the kerf being a top surface of a bottom rail.

**18**. A method as recited in claim **17**, wherein the rotating step comprises inserting a tool into a slot disposed in the anchoring washer and rotating the anchoring washer using the tool.

**19**. A method as recited in claim **17**, wherein the anchoring washer is disposed within a kerf of the fourth surface tile after the rotating step.

* * * * *

**ADDENDUM**

**EXHIBIT 4**

**Table C-5.**

**U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending March 31, 2015**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| TOTAL | 204,036 | 8.6 | 42,464 | 5.2 | 132,724 | 8.5 | 26,286 | 12.8 | 2,562 | 25.2 |
| DC | 1,757 | 7.8 | 791 | 5.8 | 925 | 9.0 | 17 | 32.9 | 24 | 48.3 |
| 1ST | 5,951 | 12.2 | 1,319 | 5.3 | 3,205 | 13.3 | 1,342 | 15.2 | 85 | 26.2 |
| ME | 482 | 8.1 | 150 | 5.9 | 306 | 8.7 | 15 | 18.8 | 11 | 20.0 |
| MA | 2,527 | 9.2 | 671 | 3.3 | 745 | 8.3 | 1,065 | 14.9 | 46 | 27.8 |
| NH | 471 | 8.1 | 89 | 3.9 | 230 | 7.2 | 143 | 14.2 | 9 | - |
| RI | 1,633 | 23.0 | 280 | 16.8 | 1,319 | 26.1 | 31 | 15.1 | 3 | - |
| PR | 838 | 13.4 | 129 | 7.4 | 605 | 13.2 | 88 | 20.5 | 16 | 29.7 |
| 2ND | 20,942 | 9.6 | 3,266 | 4.7 | 12,522 | 9.5 | 4,880 | 12.7 | 274 | 33.7 |
| CT | 1,738 | 10.4 | 498 | 4.9 | 704 | 9.8 | 497 | 19.0 | 39 | 39.4 |
| NY,N | 1,225 | 10.8 | 202 | 3.3 | 676 | 12.0 | 326 | 14.6 | 21 | 32.6 |
| NY,E | 6,689 | 9.5 | 1,419 | 5.8 | 3,715 | 9.5 | 1,466 | 11.9 | 89 | 33.6 |
| NY,S | 9,677 | 8.9 | 923 | 3.7 | 6,134 | 8.2 | 2,512 | 11.9 | 108 | 30.3 |
| NY,W | 1,378 | 11.4 | 212 | 4.8 | 1,078 | 12.3 | 75 | 17.9 | 13 | 43.4 |
| VT | 235 | 10.8 | 12 | 3.3 | 215 | 10.9 | 4 | - | 4 | - |
| 3RD | 22,605 | 6.7 | 2,627 | 3.9 | 15,791 | 5.6 | 3,944 | 12.2 | 243 | 28.1 |
| DE | 1,945 | 10.7 | 576 | 5.2 | 1,076 | 12.2 | 256 | 18.2 | 37 | 34.4 |
| NJ | 6,696 | 6.9 | 512 | 3.8 | 3,849 | 4.5 | 2,280 | 13.6 | 55 | 36.4 |
| PA,E | 10,048 | 5.0 | 724 | 3.2 | 7,957 | 4.1 | 1,265 | 9.2 | 102 | 19.9 |
| PA,M | 1,750 | 9.8 | 381 | 6.0 | 1,276 | 10.5 | 69 | 16.9 | 24 | 23.0 |
| PA,W | 1,936 | 7.0 | 293 | 2.8 | 1,621 | 8.0 | 13 | 18.2 | 9 | - |
| VI | 230 | 14.0 | 141 | 13.1 | 12 | 11.4 | 61 | 13.3 | 16 | 38.2 |
| 4TH | 16,363 | 7.3 | 2,494 | 5.8 | 12,408 | 7.0 | 1,296 | 10.3 | 165 | 18.2 |
| MD | 3,083 | 7.6 | 482 | 7.3 | 1,924 | 5.9 | 643 | 12.5 | 34 | 21.0 |
| NC,E | 1,225 | 8.2 | 565 | 5.5 | 642 | 10.6 | 8 | - | 10 | 29.2 |
| NC,M | 729 | 12.5 | 416 | 9.6 | 277 | 17.8 | 34 | 17.6 | 2 | - |
| NC,W | 889 | 8.6 | 205 | 7.4 | 614 | 8.3 | 59 | 16.8 | 11 | 20.3 |
| SC | 2,312 | 9.2 | 179 | 3.3 | 2,073 | 9.7 | 36 | 9.2 | 24 | 29.3 |
| VA,E | 2,098 | 5.2 | 423 | 3.7 | 1,185 | 4.4 | 438 | 7.8 | 52 | 16.0 |
| VA,W | 604 | 10.0 | 141 | 5.2 | 411 | 11.5 | 40 | 11.2 | 12 | 17.9 |
| WV,N | 481 | 11.1 | 58 | 8.1 | 408 | 11.1 | 8 | - | 7 | - |
| WV,S | 4,942 | 3.2 | 25 | 1.8 | 4,874 | 3.0 | 30 | 17.1 | 13 | 21.1 |

## Table C-5. (March 31, 2015)

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **5TH** | **19,429** | **8.5** | **5,294** | **5.8** | **11,459** | **8.4** | **2,360** | **12.7** | **316** | **22.7** |
| LA,E | 2,736 | 10.3 | 110 | 3.3 | 1,455 | 9.0 | 1,117 | 13.8 | 54 | 17.7 |
| LA,M | 608 | 11.5 | 63 | 7.6 | 481 | 10.8 | 43 | 22.2 | 21 | 35.5 |
| LA,W | 1,140 | 12.0 | 336 | 7.1 | 638 | 12.5 | 148 | 19.1 | 18 | 32.1 |
| MS,N | 579 | 10.1 | 147 | 7.4 | 260 | 10.3 | 157 | 12.6 | 15 | 22.9 |
| MS,S | 1,260 | 10.5 | 714 | 9.6 | 485 | 10.7 | 32 | 19.1 | 29 | 21.5 |
| TX,N | 3,277 | 6.7 | 641 | 5.0 | 2,587 | 7.1 | 4 | - | 45 | 26.1 |
| TX,E | 2,992 | 8.3 | 1,004 | 6.1 | 1,939 | 9.4 | 23 | 22.8 | 26 | 22.1 |
| TX,S | 4,648 | 6.9 | 1,644 | 4.4 | 2,185 | 7.9 | 734 | 8.2 | 85 | 22.4 |
| TX,W | 2,189 | 6.9 | 635 | 6.2 | 1,429 | 6.5 | 102 | 16.1 | 23 | 20.5 |
| **6TH** | **17,738** | **11.3** | **6,106** | **8.3** | **7,946** | **11.6** | **3,500** | **12.6** | **186** | **26.5** |
| KY,E | 1,082 | 9.6 | 134 | 7.2 | 933 | 9.7 | 10 | 26.3 | 5 | - |
| KY,W | 1,021 | 8.5 | 232 | 3.3 | 732 | 9.0 | 47 | 15.4 | 10 | 17.1 |
| MI,E | 3,942 | 8.8 | 896 | 3.3 | 1,354 | 6.2 | 1,659 | 13.4 | 33 | 22.5 |
| MI,W | 1,004 | 9.1 | 142 | 3.3 | 680 | 10.0 | 176 | 12.1 | 6 | - |
| OH,N | 4,960 | 18.6 | 2,315 | 23.7 | 1,767 | 25.7 | 861 | 9.9 | 17 | 22.2 |
| OH,S | 2,417 | 9.3 | 1,173 | 5.6 | 562 | 11.1 | 654 | 12.4 | 28 | 16.5 |
| TN,E | 1,185 | 12.9 | 405 | 9.5 | 666 | 13.2 | 75 | 20.6 | 39 | 55.5 |
| TN,M | 1,233 | 12.3 | 193 | 8.2 | 1,009 | 12.5 | 3 | - | 28 | 25.3 |
| TN,W | 894 | 11.2 | 616 | 10.3 | 243 | 11.8 | 15 | 26.9 | 20 | 27.4 |
| **7TH** | **23,070** | **14.2** | **4,486** | **6.3** | **16,467** | **18.5** | **1,939** | **12.0** | **178** | **27.3** |
| IL,N | 8,489 | 7.4 | 2,190 | 4.8 | 5,779 | 8.3 | 427 | 10.6 | 93 | 28.8 |
| IL,C | 704 | 10.5 | 331 | 7.7 | 358 | 13.0 | 8 | - | 7 | - |
| IL,S | 8,171 | 39.0 | 1,020 | 15.9 | 7,136 | 41.1 | 8 | - | 7 | - |
| IN,N | 1,804 | 10.4 | 227 | 3.7 | 1,096 | 9.5 | 458 | 16.0 | 23 | 28.5 |
| IN,S | 2,109 | 8.7 | 301 | 4.4 | 1,006 | 6.4 | 786 | 11.3 | 16 | 27.3 |
| WI,E | 1,098 | 6.1 | 232 | 3.0 | 825 | 7.0 | 22 | 12.6 | 19 | 26.2 |
| WI,W | 695 | 8.5 | 185 | 3.6 | 267 | 7.7 | 230 | 11.0 | 13 | 18.2 |
| **8TH** | **10,396** | **9.4** | **3,830** | **5.1** | **5,350** | **10.7** | **1,053** | **13.7** | **163** | **25.2** |
| AR,E | 1,131 | 11.8 | 271 | 15.1 | 831 | 11.0 | 7 | - | 22 | 18.7 |
| AR,W | 839 | 12.0 | 152 | 11.9 | 664 | 12.0 | 2 | - | 21 | 22.7 |
| IA,N | 500 | 4.9 | 164 | 0.9 | 327 | 7.1 | 5 | - | 4 | - |
| IA,S | 501 | 8.1 | 76 | 4.0 | 261 | 5.1 | 156 | 15.4 | 8 | - |
| MN | 2,689 | 7.6 | 1,028 | 2.3 | 892 | 12.2 | 737 | 12.9 | 32 | 24.4 |
| MO,E | 1,893 | 8.4 | 810 | 4.5 | 1,053 | 10.7 | 1 | - | 29 | 24.8 |
| MO,W | 1,898 | 9.9 | 1,164 | 8.3 | 597 | 11.8 | 121 | 14.2 | 16 | 28.9 |
| NE | 499 | 7.4 | 44 | 3.8 | 423 | 7.4 | 15 | 20.4 | 17 | 27.2 |
| ND | 205 | 8.2 | 11 | 0.9 | 190 | 8.7 | 1 | - | 3 | - |
| SD | 241 | 9.2 | 110 | 1.3 | 112 | 15.5 | 8 | - | 11 | 33.4 |

## Table C-5. (March 31, 2015—Continued)

| Circuit and District | Total Cases | | No Court Action | | Before Pretrial | | Court Action | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **9TH** | **32,381** | **7.2** | **7,961** | **4.5** | **20,810** | **7.2** | **3,116** | **13.6** | **494** | **23.8** |
| AK | 249 | 8.1 | 47 | 6.2 | 196 | 8.1 | 1 | - | 5 | - |
| AZ | 2,242 | 7.9 | 136 | 2.9 | 1,619 | 6.4 | 454 | 14.5 | 33 | 27.1 |
| CA,N | 4,439 | 7.9 | 873 | 4.3 | 2,187 | 6.6 | 1,315 | 13.3 | 64 | 30.0 |
| CA,E | 2,658 | 8.5 | 874 | 6.0 | 1,678 | 9.7 | 73 | 17.3 | 33 | 29.6 |
| CA,C | 11,755 | 5.4 | 3,672 | 4.5 | 7,730 | 5.6 | 181 | 14.3 | 172 | 19.3 |
| CA,S | 2,164 | 6.2 | 349 | 3.0 | 1,079 | 4.9 | 700 | 12.9 | 36 | 34.3 |
| HI | 550 | 7.8 | 274 | 5.9 | 238 | 7.6 | 27 | 21.0 | 11 | 22.6 |
| ID | 363 | 10.8 | 19 | 2.3 | 263 | 10.1 | 74 | 17.3 | 7 | - |
| MT | 414 | 9.7 | 136 | 4.4 | 126 | 8.1 | 140 | 14.0 | 12 | 24.2 |
| NV | 2,139 | 9.0 | 224 | 5.2 | 1,776 | 9.7 | 120 | 7.8 | 19 | 37.1 |
| OR | 1,934 | 11.1 | 501 | 6.7 | 1,381 | 12.1 | 10 | 14.5 | 42 | 21.6 |
| WA,E | 663 | 9.5 | 221 | 4.9 | 422 | 10.6 | 6 | - | 14 | 32.3 |
| WA,W | 2,769 | 7.4 | 613 | 3.0 | 2,104 | 8.0 | 8 | - | 44 | 18.8 |
| GUAM | 21 | 19.1 | 6 | - | 8 | - | 6 | - | 1 | - |
| NMI | 21 | 9.4 | 16 | 9.1 | 3 | - | 1 | - | 1 | - |
| **10TH** | **8,599** | **9.4** | **1,936** | **4.0** | **5,340** | **10.2** | **1,164** | **13.3** | **159** | **26.9** |
| CO | 2,705 | 7.0 | 840 | 4.1 | 1,729 | 8.3 | 75 | 19.1 | 61 | 28.4 |
| KS | 1,305 | 9.0 | 394 | 4.2 | 795 | 10.1 | 85 | 20.8 | 31 | 24.6 |
| NM | 1,020 | 11.0 | 69 | 1.7 | 451 | 8.8 | 487 | 13.1 | 13 | 28.0 |
| OK,N | 649 | 10.9 | 55 | 2.6 | 581 | 11.4 | 10 | 23.7 | 3 | - |
| OK,E | 454 | 14.3 | 25 | 3.1 | 423 | 14.7 | 2 | - | 4 | - |
| OK,W | 1,116 | 8.2 | 293 | 4.2 | 462 | 8.7 | 343 | 10.2 | 18 | 20.3 |
| UT | 1,138 | 11.9 | 196 | 4.0 | 857 | 12.9 | 67 | 23.3 | 18 | 34.7 |
| WY | 212 | 12.3 | 64 | 5.2 | 42 | 13.6 | 95 | 13.2 | 11 | 21.3 |
| **11TH** | **24,805** | **6.8** | **2,354** | **4.3** | **20,501** | **6.6** | **1,675** | **12.8** | **275** | **21.9** |
| AL,N | 2,195 | 12.8 | 49 | 1.4 | 2,095 | 12.7 | 29 | 25.7 | 22 | 25.6 |
| AL,M | 651 | 9.0 | 68 | 4.9 | 546 | 8.9 | 27 | 20.7 | 10 | 19.8 |
| AL,S | 443 | 7.7 | 68 | 3.0 | 360 | 7.8 | 9 | - | 6 | - |
| FL,N | 1,099 | 7.1 | 36 | 4.4 | 1,025 | 7.1 | 15 | 12.2 | 23 | 13.2 |
| FL,M | 7,094 | 8.5 | 570 | 6.4 | 6,294 | 8.4 | 154 | 15.8 | 76 | 23.5 |
| FL,S | 7,724 | 4.7 | 883 | 4.1 | 6,648 | 4.7 | 110 | 8.7 | 83 | 15.7 |
| GA,N | 4,074 | 6.6 | 334 | 2.4 | 2,385 | 4.5 | 1,316 | 12.1 | 39 | 28.0 |
| GA,M | 930 | 12.2 | 198 | 7.7 | 711 | 12.4 | 9 | - | 12 | 25.5 |
| GA,S | 595 | 9.6 | 148 | 9.1 | 437 | 9.6 | 6 | - | 4 | - |

NOTE: Median time intervals are not computed when fewer than 10 cases reported. This table excludes land condemnations, prisoner petitions, deportation reviews, recovery of overpayments, and enforcement of judgments. Includes cases filed in previous years as consolidated cases that thereafter were severed into individual cases. For fiscal years prior to 2001, this table included data on recovery of overpayments and enforcement of judgments.